[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 309.]

DEROLPH ET AL., APPELLEES, *v*. THE STATE OF OHIO ET AL., APPELLANTS.

[Cite as *DeRolph v. State*, 2001-Ohio-1343.]

*Constitutional law—Education—Schools—School-funding formula adopted by General Assembly modified by Supreme Court to meet test for constitutionality created in DeRolph I and DeRolph II.*

(No. 99-570—Submitted June 20, 2001—Decided September 6, 2001.)

Common Pleas Court of Perry County, No. 22043.

DECISION AND ORDER on Exercise of Continuing Jurisdiction.

_____

**MOYER, C.J.**

{¶ 1} Since it was first docketed in this court in 1995, this dispute has produced from this court no fewer than three signed majority opinions, a *per curiam* opinion, eleven separate concurrences and dissents, and a number of rulings on motions filed by plaintiffs and defendants. Every justice of the court has expressed her and his views regarding the constitutional issue that once again is presented for our disposition nearly six years after the court exercised its discretionary jurisdiction to review the merits. The written opinions of the justices reflect deeply held beliefs regarding the responsibility of the court as an institution and the principles that define the framework by which each justice decides issues brought to the court. The informal and formal discussions among the justices regarding the jurisdictional and merit issues have been of an intensity and duration unmatched by any other case.

{¶ 2} The range of the opinions that reflect the decisional process is broad. For instance, some of us believe that the court exceeded its proper role in addressing the merits of this case, *DeRolph v. State* (1997), 78 Ohio St.3d 193, 264-283, 677 N.E.2d 733, 782-795 ("*DeRolph I*") (Moyer, C.J., Cook and Lundberg Stratton, JJ.,

dissenting), and thereafter in continuing jurisdiction of this matter, *DeRolph v. State* (1997), 78 Ohio St.3d 419, 423-424, 678 N.E.2d 886, 889-890 (Lundberg Stratton, J., concurring in part and dissenting in part). One of us has characterized the "bedrock constitutional challenge" presented by this case as being quite simply the "horrible funding inequities that persist between school districts in Ohio due to the state's heavy reliance on local property taxes in formulating the school foundation formula." *DeRolph v. State* (2000), 89 Ohio St.3d 1, 46, 728 N.E.2d 993, 1028 ("*DeRolph II*") (Pfeifer, J., concurring). One of us has expressed the belief that the court should expressly declare education to be a fundamental right afforded to each Ohio child pursuant to the Equal Protection Clause of the Ohio Constitution. *DeRolph I*, 78 Ohio St.3d at 255-257, 677 N.E.2d at 776-777 (Douglas, J., concurring).

{¶ 3} Despite our differences, however, we all agree upon the fundamental importance of education to the children and citizens of this state. Educated, informed citizens sustain the vitality of our democratic institutions. We differ little in support of the desired ends so trenchantly recited by Justice Sweeney when he observed that our forefathers, in drafting our state Constitution, "carried within them a deep-seated belief that liberty and individual opportunity could be preserved only by educating Ohio's citizens," *DeRolph I*, 78 Ohio St.3d at 197, 677 N.E.2d at 736, and by Justice Resnick when she so incisively counseled that the goal of funding primary and secondary public education should be to assure "a quality education for every single child in Ohio regardless of where that child resides" so that every child may "enter a structurally safe building, which is staffed with sufficient teachers, and contains enough textbooks and equipment so that the child can develop self-esteem and intellectual abilities," *DeRolph I*, 78 Ohio St.3d at 260 and 261, 677 N.E.2d at 779 and 780 (Resnick, J., concurring). We agree regarding the goals of public education; we have vigorously disagreed with respect to whether the legislature or the judiciary has the ultimate authority to determine if the goals have been achieved.

{¶ 4} The current plan for funding public primary and secondary education adopted by the General Assembly and signed by the Governor[1] is probably not the plan that any one of us would have created were it our responsibility to do so. But that is not our burden, and it is not the test we apply in this decision. None of us is completely comfortable with the decision we announce in this opinion. But we have responded to a duty that is intrinsic to our position as justices on the highest court of the state. Drawing upon our own instincts and the wisdom of Thomas Jefferson, we have reached the point where, while continuing to hold our previously expressed opinions, the greater good requires us to recognize "the necessity of sacrificing our opinions sometimes to the opinions of others for the sake of harmony." 16 Papers of Thomas Jefferson (Boyd Ed.1961) 598 (letter to Francis Eppes, July 4, 1790).

{¶ 5} A climate of legal, financial, and political uncertainty concerning Ohio's school-funding system has prevailed at least since this court accepted jurisdiction of the case. We have concluded that no one is served by continued uncertainty and fractious debate. In that spirit, we have created the consensus that should terminate the role of this court in the dispute.

I

Controlling Law

{¶ 6} Pursuant to the doctrine of the law of the case, the "decision of a reviewing court in a case remains the law of that case on the legal questions involved

---

1. Since *DeRolph II,* the General Assembly has enacted, *e.g*., 2000 Am.Sub.S.B. No 272, which enhances the Classroom Facilities Assistance Program and otherwise addresses school facility deficiencies; 2000 Am.Sub.S.B. No. 345, which addresses statutory provisions previously characterized as imposing unfunded mandates, and establishes procedures to prevent fiscal problems in school districts; 2000 Am.Sub.H.B. No. 94, the biennial budget bill, which prescribes formulas for determining the amount of state funds to be distributed to the various school districts; and 2001 Am.Sub.S.B. No. 1, which establishes a new system of academic standards and testing to gauge the success of Ohio students and schools.

for all subsequent proceedings in the case at both the trial and reviewing levels." *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, 3, 11 OBR 1, 2-3, 462 N.E.2d 410, 412.

{¶ 7} On March 24, 1997 a majority of this court held, as syllabus law:

"Ohio's elementary and secondary public school financing system violates Section 2, Article VI of the Ohio Constitution, which mandates a thorough and efficient system of common schools throughout the state. The following specific provisions are unconstitutional:

"(a) R.C. 133.301, granting borrowing authority to school districts;

"(b) R.C. 3313.483, 3313.487, 3313.488, 3313.489, and 3313.4810, the emergency school assistance loan provisions;

"(c) R.C. 3317.01, 3317.02, 3317.022, 3317.023, 3317.024, 3317.04, 3317.05, 3317.051 and 3317.052, the School Foundation Program;

"(d) R.C. Chapter 3318, the Classroom Facilities Act, to the extent that it is underfunded." *DeRolph v. State* (1997), 78 Ohio St.3d 193, 677 N.E.2d 733, syllabus.

{¶ 8} The court admonished the General Assembly to create a new school-funding system. *Id*. at 213, 677 N.E.2d at 747.

{¶ 9} In April 1997, this court advised that the General Assembly may well retain local property taxes as a funding source for Ohio schools, but that "property taxes can no longer be the primary means of providing the finances for a thorough and efficient system of schools." *DeRolph v. State* (1997), 78 Ohio St.3d 419, 678 N.E.2d 886, 887. We also held that debt obligations incurred prior to *DeRolph I* remained valid beyond the date of *DeRolph I*. *Id*. at 420, 678 N.E.2d at 887.

{¶ 10} In September 1998, we made it clear that *only* the Thorough and Efficient Clause of the Ohio Constitution, and not the Equal Protection Clause, remained at issue in this case. *DeRolph v. State* (1998), 83 Ohio St.3d 1212, 699 N.E.2d 518. The court further held that the state would be required to "show by a

preponderance of the evidence that the constitutional mandates have been satisfied" in order to justify dismissal of the proceedings against them. *Id.*

{¶ 11} A year ago, the majority established further law of this case. The syllabus to *DeRolph v. State* (2000), 89 Ohio St.3d 1, 728 N.E.2d 993 (*DeRolph II*), provides:

"1. '[T]he sovereign people made it mandatory upon the General Assembly to secure not merely a system of common schools,' but rather a thorough and efficient system of common schools. *Miller v. Korns* (1923), 107 Ohio St. 287, 297-298, 140 N.E. 773, 776, approved and followed.

"2. 'The attainment of efficiency and thoroughness in that system' of common schools is 'expressly made a purpose, not local, not municipal, but state-wide.' *Id.*, approved and followed.

"3. A thorough system means that each and every school district has enough funds to operate. An efficient system means one in which each and every school district in the state has an ample number of teachers, sound buildings that are in compliance with state building and fire codes, and equipment sufficient for all students to be afforded an educational opportunity."

{¶ 12} The court in *DeRolph II* retained continuing jurisdiction to provide additional time for the state to further refine the school-funding system. We acknowledged, however, that significant improvements in Ohio's system of common schools had been achieved in the time that elapsed between *DeRolph I* and *DeRolph II*.

{¶ 13} Most recently, we recognized that, in order to decide whether the state's funding system now is constitutional, we must examine Ohio's statutory school-funding system as designed by defendants as of June 15, 2001, and determine "the likely effects that the legislation enacted in response to [*DeRolph II*] will produce." *DeRolph v. State* (2001), 91 Ohio St.3d 1274, 1276, 747 N.E.2d 823, 824.

**{¶ 14}** It is the law contained in the syllabi to *DeRolph I* and *DeRolph II* and the principles established by court entry in the case at bar by which we are required to evaluate the constitutionality of the school-funding system now statutorily in place. See *Thackery v. Helfrich* (1931), 123 Ohio St. 334, 336, 175 N.E. 449, 450 (this court "announces the law only through the syllabi of cases and through *per curiam* opinions"); S.Ct.R.Rep.Op. 1(B) ("The syllabus of a Supreme Court opinion states the controlling point or points of law decided in and necessarily arising from the facts of the specific case before the Court for adjudication").

II

Adequacy of Funding; Assurance of "Ample Number of Teachers, Sound Buildings in Compliance with State Building and Fire Codes, and Equipment Sufficient for All Students to be Afforded an Educational Opportunity" (*DeRolph II*, Paragraph Three of the Syllabus)

A

Adequacy of Funding—Base Cost Formula

**{¶ 15}** As defined in *DeRolph II,* a "thorough system means that each and every school district has enough funds to operate." 89 Ohio St.3d 1, 728 N.E.2d 993, paragraph three of the syllabus. To this end, the General Assembly has been charged with determining the amount of funding that is adequate to establish a "constitutionally required foundation of basic educational opportunity." *Id.* at 47, 728 N.E.2d at 1029 (Pfeifer, J., concurring). Unlike the formula determined to be problematic by this court in *DeRolph II*, the General Assembly has offered a new funding formula to arrive at the base cost of providing for an adequate education.

**{¶ 16}** Under 2001 H.B. No. 94, the General Assembly recalculated the cost of providing an adequate education to be $4,814 per student in fiscal year 2002. R.C. 3317.012(A). This figure is increased by 2.8 percent per year to account for rising costs, resulting in a base cost per student of $5,527 in fiscal year 2007. R.C. 3317.012(A)(1). A most significant aspect of H.B. 94 is that the base cost amount

of $4,814 is funded in the full amount *immediately* without a phase-in period. Removal of the phase-in period addresses a key concern of *DeRolph II* that the state was "funding below the level that the General Assembly deemed to be the base amount for an adequate education," 89 Ohio St.3d at 18-19, 728 N.E.2d at 1007, and the statement that the "phase-in aspect of the basic aid amount should be reconsidered." *Id.* at 37, 728 N.E.2d at 1021.

{¶ 17} The formula adopted by the General Assembly has changed in other significant ways. To determine the base cost of an adequate education, the new formula uses the unweighted average cost per student of educating students enrolled in selected districts. Under the new law, this selection began with one hundred seventy school districts that, in fiscal year 1999, met at least twenty of twenty-seven performance standards established by H.B. 94. R.C. 3317.012(B)(1)(a) through (aa). Districts in the top and bottom five percent of income and property wealth bases are deleted to adjust for anomalies within those districts, leaving one hundred twenty-seven model districts.

{¶ 18} The H.B. 94 methodology for determining state aid considers the following factors: base cost, the district's cost of doing business, the districts' average daily membership ("ADM"), property valuation, and the charge-off rate of twenty-three mills ($0.023) per dollar of valuation. The formula is ADM x base cost x cost-of-doing-business factor – 0.23 x property valuation = state aid to a school district for basic education costs. R.C. 3317.022.

{¶ 19} H.B. 94 adopts a charge-off rate of twenty-three mills per dollar of valuation. R.C. 3317.022. Additionally, H.B. 94 continues to provide a charge-off supplement, termed "gap aid," to account for districts that are not able to fund their local share of the base cost amount. H.B. 94 applies gap aid not only to base cost, special education costs, and vocational education costs, but also to transportation costs. R.C. 3317.0216(C)(1). H.B. 94 also eliminates the phase-in of state funding increases. Greater gap aid addresses the problem of "phantom revenue" by assuring

that the state will contribute more funding to districts where the tax base does not increase at the same rate as the increase in the base cost amount.

{¶ 20} As an additional measure to ensure that no district is unable to fund programs because of its small local tax base, the General Assembly has enacted legislation that requires districts to pay no more than an additional three mills of local tax revenue to provide for their share of special education, vocational education, and transportation. R.C. 3317.022(F). H.B. 94 restructures the manner in which the state contributes to such programs.

{¶ 21} The state has also reassessed the manner in which it approaches transportation costs. Under H.B. 94, the state's share of transportation costs is the *greater of* sixty percent or the same percentage that the state pays for the district's base cost. R.C. 3317.022(B)(2), (D)(3). According to the state's experts, this greater level of funding will benefit rural, property-poor districts that have greater transportation needs.

{¶ 22} H.B. 94 further adds six weights to determine the method by which special education is funded. R.C. 3317.013(A) through (F). In part as a result of the new weights, the state projects that state special education funding will increase 18.6 percent from fiscal year 2001 to fiscal year 2003. The percentage of the state's share increases automatically once a district's cost of serving a special education student exceeds $30,000 in category six of the special education categories and $25,000 for categories two through five. R.C. 3317.022(C)(3). The state funds one hundred percent of half the costs above the applicable threshold, plus the calculated state share percentage of the other half. R.C. 3317.022(C)(3)(a)(i) and (ii).

B

Parity Aid

{¶ 23} In addition to modifying the base cost formula, the General Assembly has also enacted another form of aid termed "parity aid" by the state. Parity aid addresses disparities between wealthier districts and poorer districts and provides additional funds to the latter. As designed by the General Assembly, parity aid is intended to give low-wealth districts the opportunity to spend funds on discretionary items in the same manner as wealthier districts. The General Assembly determined that in fiscal year 2001, school districts in the seventieth to ninetieth percentile in valuation per pupil collected an average of 9.5 mills beyond the millage necessary to fund their calculated local share of the base cost amount, special education, vocational education, and transportation funding. R.C. 3317.0217(C)(2). With parity aid, eligible districts will receive funding to make up the difference between what they can raise on 9.5 mills and what the district at the eightieth percentile in income-adjusted wealth can raise ($1,300). R.C. 3317.0217(C). The amount of parity aid distributed, therefore, will vary on a district-by-district basis depending upon how far below the eightieth percentile a district falls. Defendants estimate that parity aid will provide an additional $100 million to eighty percent of school districts in fiscal year 2002 and an additional $500 million per year when the program is fully phased in by fiscal year 2006.

{¶ 24} Parity aid is designed to address disparities in tax bases even after ensuring full funding of the base cost, special and vocational education, and transportation costs. The ability to receive parity aid, however, is not dependent upon local effort. If a district is unable or unwilling to generate additional funding, it will still receive parity aid if it falls below the eightieth percentile. For example, the state estimates that New Lexington City School District in Perry County would receive an additional $774 per student this year if parity aid were fully phased in, for a total $1.4 million per year, and the Cleveland City School District would

receive an additional $601 per student, for a total of $43,873,307 per year. All of the money provided under the parity aid program is paid above the base cost amount and equalizes disparities in the amount needed to address the adequacy concerns of *DeRolph II*.

{¶ 25} Additionally, H.B. 94 incorporates a "stabilizing" function to ensure that the "state share percentage of base cost and parity aid funding" (defined in R.C. 3317.012[D][5]) does not vary by more than 2.5 percent between the current year and the last year in which a calculated base cost amount took effect, *i.e.*, the "update years" (defined in R.C. 3317.012[D][1]). If the General Assembly estimates that the state share percentage will vary by more than 2.5 percent from the preceding update year, it must bring the state share back within the allowable variance by any means it determines to be necessary. R.C. 3317.012(D)(4).

{¶ 26} Parity aid and gap aid are significant, expansive aspects of the new legislation that reflect defendants' genuine efforts in complying with the rulings of this court.

C

Facilities

{¶ 27} This court in *DeRolph II* held that an efficient system of common schools is one in which school districts throughout the state have "sound buildings that are in compliance with state building and fire codes." *Id.,* 89 Ohio St.3d 1, 728 N.E.2d 993, paragraph three of the syllabus. Plaintiffs argue that many deficient school buildings are still in use today. But in deciding whether the school-funding system created in the legislation under review is constitutional, we must determine only whether, when fully implemented, the legislation enacted in response to *DeRolph II* will likely have the effect of bringing these facilities into compliance within a reasonable time. When determining what is a reasonable time, we must realize that construction and renovation are necessarily lengthy and complex processes and are not amenable to a one-year or even a five-year deadline.

**{¶ 28}** There is a well-documented need for many of Ohio's school buildings to be renovated, repaired, or replaced, or for completely new facilities to be constructed, in order to meet the standards established by *DeRolph II*. Construction of this magnitude will necessarily be complex and time-consuming.

**{¶ 29}** The state of Ohio has dedicated a large amount of its budget to constructing and repairing school facilities. Since 1998, the General Assembly has allocated nearly $2.7 billion to this effort. The Ohio School Facilities Commission directs this funding to local school districts, and as of May 2001 was distributing an average $1.5 million dollars *daily*—a number that continues to grow. Additionally, the Facilities Commission provides management oversight and technical assistance to the local school districts for construction and renovation. Building Our Future, Ohio School Facilities Commission FY 2000 Annual Report, at 3.

**{¶ 30}** The state has devised multiple interlocking programs that address different aspects of the school facilities problem. For example:

● Since 1997, the Classroom Facilities Assistance Program has funded replacement and renovation projects in seventy-three school districts, expending over $1.8 billion in state funding. Building Our Future, at 8.

● The Exceptional Needs Program provides immediate assistance to districts of below average wealth with exceptional needs for classroom facilities. R.C. 3318.37.

● The Expedited Local Partnership Program allows school districts to fund repair or construction through local monies before their state funding becomes available through the Classroom Facilities Assistance Program. R.C. 3318.36. Once funds from the program become available, the school district receives credit for their required local contribution. Eligibility for the program was recently expanded by amendment of R.C. 3318.36 by 2000 Am.Sub.S.B. No. 272.

● The "Big 8" and Accelerated Urban School Building Assistance Programs target urban school districts for major renovations and repairs. 1997 Am.Sub.S.B. No. 102, Section 7, 147 Ohio Laws, Part IV, 7416; R.C. 3318.38, enacted by 2000 Am.Sub.S.B. No. 272; Building Our Future, at 10. The Big 8 Program is authorized to provide up to $120 million in matching funds, and includes the larger districts in the state, such as the Akron, Toledo, Dayton, Cincinnati, Columbus, and Cleveland city schools. Building Our Future, at 10. As of the end of calendar year 2000, these districts had spent over fifty percent of the funds available to them. *Id.*

● The Extreme Environmental Contamination Program provides assistance for any classroom facility that needs to be replaced or relocated due to extreme environmental contamination. H.B. No. 94, Section 186.

● The School Building Emergency Assistance Program provides assistance to all school districts to reconstruct, repair, or renovate classroom facilities damaged by an act of God. R.C. 3318.351(A)(2).

{¶ 31} Significant progress has been made to date. The Facilities Commission has provided facilities funding to three hundred sixty-four school districts. OSFC: All District Summary, Ohio School Facilities Commission. As of May 2001, the commission was administering projects that will provide for over three hundred additional buildings, and will complete fifty full building fixes by the end of 2001.

{¶ 32} In addition, S.B. 272 requires the state to make a facilities assessment within two years of a request by the school district. R.C. 3318.022. Complete facilities assessments will have been performed on four hundred and fifty districts by the end of 2001. These facilities assessments are crucial to determining what needs remain to be addressed in terms of repair and construction.

{¶ 33} Plaintiffs argue that the state is not doing enough to remedy the facilities problem. First, plaintiffs argue that the state's timetable for fixing these problems is too slow. As we have observed above, however, to pass constitutional

muster the state must have in place legislation that will be likely to bring school facilities into compliance within a reasonable time.

{¶ 34} Plaintiffs also argue that future funding for school facilities remains uncertain. We acknowledge that there is no legislation currently in place that guarantees funding for the programs outlined beyond the current biennium. However, this concern is inherent in a democracy where public policy is never stagnant, and in a state that operates on a biennial budget. As was noted in *DeRolph II*, the duration of any legislative appropriation is "limited by the prohibition of Section 22, Article II of the Ohio Constitution, which prohibits the General Assembly from appropriating for more than a two-year period." *DeRolph II*, 89 Ohio St.3d at 24, 728 N.E.2d at 1011. Were it necessary to guarantee funding in the future, this court would be required to retain jurisdiction in this cause in perpetuity.

{¶ 35} Plaintiffs argue that in the current system, local school districts are required to contribute to financing of the repair, renovation, and construction of school buildings, and that this necessarily violates the strictures set down in *DeRolph II*. However, nothing in the Ohio Constitution or any of the controlling law of this case precludes the state from insisting on joint state-local support of primary and secondary schools.

{¶ 36} Plaintiffs also argue that the state has not performed a comprehensive survey to determine whether school buildings are in compliance with building and fire codes. However, as discussed earlier, S.B. 272 requires the state to make a complete assessment within two years upon receiving a request from a local school district. R.C. 3318.022. This method of assessing the schools is reasonable, given the practicalities of such a project.

{¶ 37} The Ohio School Facilities Commission has developed comprehensive guidelines for the design and construction of commission-funded buildings. Building Our Future, Ohio School Facilities Commission FY 2000 Annual Report, at 7. Plaintiffs maintain that these guidelines require schools to

accept buildings that are inadequate for educational needs. Specifically, plaintiffs assert that the guidelines provide for inadequate numbers of rooms if the twenty-five-to-one student-teacher ratio is to be maintained. Inadequacies in School Facilities: A Review of the State's Program, Ohio Coalition for Equity & Adequacy of School Funding, at 2. They note that the twenty-five-to-one ratio dictates the size of the room, and that school districts that wish to have a lower student-teacher ratio will find themselves forced to add additional rooms at their own expense.

{¶ 38} The state's funding initiative for school districts with a substantial portion of families living below the poverty line, Disadvantaged Pupil Impact Aid ("DPIA"), has reduction in classroom size as one of its primary goals. The class-size-reduction portion of DPIA requires districts to focus their efforts on reducing the student-teacher ratio in kindergarten through third grades. The target student-teacher ratio for individual districts is calculated through use of a complicated index based on the concentration of students in the district living below the poverty line. R.C. 3317.029(E). Options available to the school districts are not limited to reducing the number of students in a classroom taught by a single teacher but include the use of teacher's aides, team teaching, and extending the length of the school day or school year. R.C. 3317.029(F)(3).

{¶ 39} The Legislative Office of Education reported in October 2000 that the average number of students in kindergarten through third grade in five selected districts receiving DPIA varied from eighteen to twenty-four students. Barriers to achieving a reduced student-teacher ratio do exist, including the uncertainty of sustained funding of additional teachers and lack of classroom space. These are serious concerns. However, the commission conducts a ten-year projected enrollment analysis prior to beginning design work for a district, and designs facilities based on the highest enrollment figure in that ten-year period, or enrollment in the third year if enrollment is declining. If something occurs later to change this figure, the commission works with the district to make any necessary

14

adjustments. Currently, more than half of those districts reporting a need for more space are working with the Ohio School Facilities Commission to resolve the problem. On balance, we find that the problem of student-teacher ratio as it relates to facilities can be improved through state and local collaboration within the existing legislative framework, and we do not find that the admittedly imperfect current situation is grounds for striking down the legislative framework as unconstitutional. We decline to find that the guidelines as promulgated by the Ohio School Facilities Commission result in inadequate buildings.

D

Adequacy of Funding for Teachers and Supplies

{¶ 40} The majority in *DeRolph I* concluded that the record contained exhaustive evidence that "the appellant school districts were starved for funds, lacked teachers, buildings, and equipment, and had inferior educational programs, and that their pupils were being deprived of educational opportunity." *DeRolph I*, 78 Ohio St.3d at 205, 677 N.E.2d at 742. That record demonstrated that some of the poorest school districts in the state at that time were forced to ration even basic supplies: "paper, chalk, art supplies, paper clips, and even toilet paper." *Id.* at 208, 677 N.E.2d at 744. The evidence revealed instances of schools where textbooks were not available to every student, *id.* at 259, 677 N.E.2d at 778, and classes were held under leaking roofs and in former coal bins, *id.* at 241, 255, 677 N.E.2d at 766, 755 (Douglas, J., concurring).

{¶ 41} The record before us today is very different. The plaintiffs now assert that "educational deprivation" exists because, *e.g.*, within the one hundred twenty-seven districts used to calculate the base amounts, one district has the "least number of teachers allowable to operate a district," not all high schools offer advanced placement classes, some *elementary* schools lack space for science labs, and art and music classes in some districts must share the same room. These

complaints simply do not equate to deprivation of an opportunity to receive a basic education.

{¶ 42} The second paragraph of the syllabus to *DeRolph II*, 89 Ohio St.3d 1, 728 N.E.2d 993, establishes the legal proposition that efficiency and thoroughness in Ohio's system of common schools is a statewide goal rather than a local one. In April 2000, Governor Taft created the Governor's Commission for Student Success, whose members included parents, educators, community leaders, and legislators. The commission conducted sixteen focus group discussions, polled one thousand Ohioans, and met with twenty-eight constituent groups to better understand Ohioans' thoughts and concerns about public education. In December 2000, the commission issued its report, entitled "Expecting More: Higher Achievement for Ohio's Students and Schools." The report contained thirty-one recommendations to create a statewide system of academic performance standards, student and school assessments, and school accountability. In January 2001, legislation incorporating recommendations from the report was introduced as Senate Bill No. 1. The bill was enacted and signed into law on June 12, 2001.

{¶ 43} In adopting and signing this legislation, the General Assembly and the Governor have adopted public policies consistent with the commission's view that, while "the state has a clear and important role in establishing statewide academic standards, * * * local flexibility in the design and implementation of instructional programs and other services to help children learn" should be retained. In the words of the commission's report, it "is appropriate for the state to say *what* should be learned in key subjects; it is much less appropriate for the state to determine *how* local schools should teach students to meet these standards." (Emphasis *sic*.)

{¶ 44} In its report, the commission stated that it "subscribes to a philosophy that keeps the state's interest as narrow as possible and gives flexibility to local school boards, administrators and teachers. But, while flexible, the

16

Commission recommendations are oriented toward action: Where students are in danger of falling behind or not meeting key state academic standards, the Commission expects local schools to act aggressively. In some cases, we actually require action. The state will provide help—additional resources, technical assistance, training and examples of strategies that work—but local educators must be the ones who provide the necessary instruction to make sure students reach the standards."

{¶ 45} Accordingly, the commission recommended that "schools be expected to provide intensive instruction and intervention services to students whose diagnostic assessments show they are unlikely to reach the academic standards. The nature of these services should be determined locally but could include summer school, extended time in school, tutoring assistance or smaller class size."

{¶ 46} This legislative plan just enacted reflects a public policy decision that local school districts and boards of education ultimately are responsible for managing and allocating their financial resources so as not only to achieve the constitutionally mandated, statewide goal of providing all students a basic educational opportunity, but to achieve a second goal as well—the goal of helping individual students take advantage of that opportunity and thereby receive the lifelong benefits of education.

{¶ 47} The current statutory system contemplates that the districts of the state will themselves determine, at least initially, on a district-by-district basis, how to allocate their resources to provide enough teachers and sufficient equipment to achieve satisfactory performance results as measured by school district and student assessments. Failure to achieve satisfactory educational results will, however, trigger state review and assistance. The commission has acknowledged that districts found to be falling short may need additional funding from the state in order to ensure that their schools are able to improve.

{¶ 48} Indeed, the evidence before us demonstrates that Ohio schools are already improving. In school evaluations issued in 2001 pursuant to R.C. 3302.03, thirty-six districts, including three urban districts, improved their designation from "academic emergency" to "academic watch." The number of school districts in "academic emergency" declined from sixty-nine to thirty-five, a reduction of nearly fifty percent. A fifteen percent increase was realized in the number of school districts rising to the status of "continuous improvement" from lower designations. For the first time, all Ohio schools met state standards for science in grades nine, ten, and twelve.

{¶ 49} Assessments show improvement at the student level as well. In comparing proficiency test results from 2001 to those from 2000, preliminary findings show that sixty percent compared to forty-nine percent of fourth graders passed the mathematics test, fifty-six percent compared to forty-eight percent passed the science test, and sixty-one percent compared to fifty-five percent of sixth graders passed the mathematics and science tests. While not all categories of test results show such striking improvements, the overall trend in the 2001 proficiency test results is one of improving performance.

{¶ 50} The new statutory framework has made positive changes in the base cost amount. The plan also restructures gap aid and introduces parity aid, as described above, to assist poor districts. The plan is designed to ensure that an adequate number of teachers and supplies will exist in every district, thereby affording every child an opportunity to receive a basic education.

III

Avoidance of Primary Reliance on Property Tax

{¶ 51} In *DeRolph I*, this court's primary concern with the state's funding system was that it relied too heavily on local property taxes to fund a statewide system. 78 Ohio St.3d at 212, 677 N.E.2d at 747. The problem this creates, as articulated in *DeRolph II*, is that a system overly reliant on local property taxes will

result in disparities between districts because the same tax effort in two different districts will produce different results. 89 Ohio St.3d at 26, 728 N.E.2d at 1013. In defining overreliance, we stated that local taxes need not be totally abandoned, because equality is not constitutionally mandated. *DeRolph I*, 78 Ohio St.3d at 211, 677 N.E.2d at 746. Rather than completely rejecting property taxes, the majority stated that "property taxes can no longer be the *primary means* of providing the finances for a thorough and efficient system of schools." (Emphasis added.) 78 Ohio St.3d at 419, 678 N.E.2d at 887. Thus, some use of local property taxes is constitutionally permissible.

{¶ 52} Therefore, disparity caused by a school-funding system that rests on the dual foundations of state support and local property tax revenues is unconstitutional only if the disparity is so dramatic that children in the poorest of our school districts are deprived of a basic educational opportunity, and a thorough and efficient distribution of funds need only ensure that each Ohio school district is financially able to offer an adequate education.

{¶ 53} In general, property taxes are less sensitive to economic cycles than are taxes based on income or sales. Property values tend to remain stable over time, whereas income and spending are affected by movements in the economy. Property taxes, therefore, give school districts a stable and reliable source of local revenue through both good and bad economic times. The problems that arise from property taxes, however, are the continuing need for school districts to raise revenue through voted local levies that are subject to the limitations of R.C. 319.301 and the unequal distribution of property wealth throughout the state. Districts that have more property wealth generate more local revenue than do poorer districts. Overreliance on property taxes, therefore, has led to disparate educational opportunities in these property poor districts. H.B. 94, however, has altered the funding structure to address the concerns of this court through three major changes.

{¶ 54} The first method by which the General Assembly has reduced the reliance on local property taxes is by altering the charge-off supplement system, known as gap aid. As previously described, gap aid supplements funding in districts that cannot produce their local share of the base cost.

{¶ 55} Second, H.B. 94 limits any district's local share of special education, vocational education, and transportation to three mills. R.C. 3317.022(F). Limiting the local share of these costs to three mills reduces the amount of local revenue a district must generate. As a consequence, and assuming that the district raises more than three mills, the limiting function raises the amount of funds available to poorer districts for discretionary spending that the district would not have if forced to pay more for its share of these programs. This, in turn, reduces the concern of a district in providing merely an adequate education and allows it to focus its spending efforts on providing more than just the basics.

{¶ 56} Third, the parity aid program contributes additional funds to poorer districts. It gives those districts the spending power of wealthier districts without requiring a district to levy any additional funds at the local level.

{¶ 57} Additionally, local contributions for construction of new school facilities are no longer contingent upon local property taxes. S.B. 272 authorizes several different options for local funding sources other than a local property tax. For example, to pay their local share required by R.C. 3318.05, districts may now apply the proceeds of an existing tax levy for general ongoing improvements or a school district income tax. R.C. 3318.052. Districts may also apply locally donated contributions toward their portion of the basic project cost. R.C. 3318.084. Two or more districts may also enter into an agreement with the Treasurer of State to pool bonds to finance their respective projects with the facilities commission. R.C. 3318.085. Finally, districts may credit as part of their local share any bonds issued for classroom facilities within eighteen months before being notified that they are eligible for state assistance, so long as the facilities supported by the bond measure

meet design specifications of the facilities commission. R.C. 3318.01(L); 3318.03; 3318.033; 3318.05; 3318.08.

{¶ 58} As we recognized in *DeRolph I*, no system of school funding could address every inequality associated with reliance on local property taxes as a basis for school funding. 78 Ohio St.3d at 211, 677 N.E.2d at 746. While this court found in *DeRolph II* that the system then in place did not meet this court's prior mandate, we recognize that the General Assembly has made significant changes to the prior structure in order to reduce reliance on local property taxes. Through changes in gap aid, millage caps, changes in base cost formulation, and the parity aid program, for example, the current system established by H.B. 94, when fully implemented in accordance with this opinion, will reduce reliance on local property taxes to a constitutionally acceptable level by providing substantially more state aid to districts less able to generate local revenue.

IV

Conclusion and Order

{¶ 59} We have thoroughly reviewed the plan now in place and are convinced that the defendants are committed to improving primary and secondary education. That commitment has operated, and can be expected to further operate, to ameliorate the undesirable educational conditions shown in *DeRolph I*.

{¶ 60} In their *amicus curiae* briefs, both Governor Bob Taft and the current majority leadership of the General Assembly have reaffirmed their commitment to staying the course of progress we have seen in the period between *DeRolph I* and today. We believe that the leaders of this General Assembly, Governor Taft, and Superintendent Zelman intend to fully implement the school-funding plan for which they have so earnestly argued.

{¶ 61} Despite the extensive efforts of the defendants to produce a plan that meets the requirements announced by this court, changes to the formula are required to make the new plan constitutional:

**{¶ 62}** Base Cost Formula*:* H.B. 94 recalculates the cost of providing an adequate education to be $4,814 per student in fiscal year 2002. The base cost formula uses one hundred twenty-seven model school districts as a basis for determining base cost support. That number of school districts is achieved by screening out districts in the top and bottom five percent of all Ohio districts based on income and property wealth from the state's pool of the one hundred seventy top-performing districts. Also included within this number are several districts that did not meet twenty of twenty-seven performance standards, but were included regardless because of a rounding procedure included within H.B. 94. R.C. 3317.012(B)(1), last paragraph. As the plaintiffs note, rounding and wealth screens include districts that should not be considered in the base cost formula and exclude districts that should be considered. Plaintiffs' arguments and our review of the record convince us that the formula must be modified to include the top five percent districts and the lower five percent districts, and by considering only those districts that *actually* meet twenty of twenty-seven performance standards without rounding. We make no determination regarding the time in which the state must calculate and implement actual changes in the amount of funds distributed to each district pursuant to today's order, but the new calculations must be applied retroactive to July 1, 2001, and to the subsequent years designated in R.C. 3317.012. Moreover, in determining future biennial budgets through fiscal year 2007, the rate of millage charged off as the local share of base cost funding under divisions (A)(1) and (2) of R.C. 3317.022 may not be changed from twenty-three mills, irrespective of the language of R.C. 3317.012(D)(4) suggesting such a methodology.

**{¶ 63}** The H.B. 94 model calculates its base cost amount using spending data for FY96, adjusted for inflation, or actual FY99 expenditure data, whichever is lower. R.C. 3317.012(B), last paragraph. The state uses the lower of the two figures to compensate for what it terms an "echo effect," or to adjust for districts that spent more than what was actually needed at the base level, due to line-item

expenditures, other state funding outside of the foundation formula, and local enhancement revenues. The model districts subject to lowering of their base cost are those that the state determined to be model districts in 1996. As the plaintiffs' experts observed, there has been insufficient evidence presented by the state to justify lowering the base cost amount to adjust for this supposed echo effect. ETPI Report, at 6. Accordingly, we are persuaded by the plaintiffs that choosing the lower of FY96 expenditures or FY99 actual expenditures is unsupported by the evidence and should not be used to lower the base cost amount figure.

{¶ 64} Parity Aid: The parity aid program is a salutary attempt to provide poorer districts with funds similar to those available to wealthier districts that are used to substantially enhance the educational experience of each student. The plan as adopted would fully fund the parity aid program by fiscal year 2006. We have concluded that the parity aid program must be fully funded no later than the beginning of fiscal year 2004.

{¶ 65} To summarize, we observe that the state has chosen to retain a foundation program of funding primary and secondary public education. We find that, having so elected, it must, in order to meet the requirements of *DeRolph I* and *DeRolph II,* formulate the base cost of providing an adequate education by using all school districts meeting twenty of twenty-seven performance standards as set forth by the General Assembly in R.C. 3317.012(B)(1)(a) through (aa), without adjustments to exclude districts based on wealth screens, without rounding adjustments to include additional lower-spending districts, and without use of the "echo effect" adjustment, beginning effective July 1, 2001. In addition, the parity aid program established by the General Assembly must be fully funded no later than July 1, 2003.

{¶ 66} With full implementation of these modifications to the funding plan adopted by the General Assembly the plan will meet the test for constitutionality created in *DeRolph I* and *DeRolph II.* While the changes will have a fiscal impact,

they will not require structural changes to the school foundation program set forth in R.C. Chapter 3317.

**{¶ 67}** One final observation is in order. Historically, the construction and maintenance of school facilities have been considered the responsibility of local school districts. By 1989, the General Assembly had begun addressing school facilities needs and committing funds to construction and repair of school buildings. We have described previously the substantial commitment of the state to the availability of adequate school buildings for every student enrolled in public education. However, the unmet needs are enormous and the time in which it is feasible to meet them is lengthy. We urge the General Assembly to review and consider alternative means of funding school buildings and related facilities.

**{¶ 68}** The state is hereby ordered to implement the changes described above. Because we have no reason to doubt defendants' good faith, we have concluded that there is no reason to retain jurisdiction of the matter before us. If the order receives less than full compliance, interested parties have remedies available to them.

*So ordered.*

DOUGLAS, PFEIFER and LUNDBERG STRATTON, JJ., concur.

DOUGLAS and PFEIFER, JJ., separately concur.

PFEIFER, J., separately concurs.

LUNDBERG STRATTON, J., separately concurs.

RESNICK, J., separately dissents.

RESNICK and F.E. SWEENEY, JJ., separately dissent.

COOK, J., separately dissents.

_____

**DOUGLAS, J., concurring.**

**{¶ 69}** As this case involves principles of great importance and may have an enduring influence on the institutions of our state, I embrace the high privilege

of stating distinctly my opinion on several of the difficult matters before us. Today a new majority decides a case to be known as *DeRolph III*. In creating this new majority, each member of this majority takes a position that substantially deviates from a previously held determination on the issues before us. Our coming to the conclusion we now reach does not mean that any one or all of us hold less dear those principles that we have expressed before. Because of the inevitable criticism of each of us individually and all of us collectively that is sure to follow, I take the time to write separately to memorialize a few thoughts.

History

{¶ 70} On March 24, 1997, this court decided *DeRolph v. State* (1997), 78 Ohio St.3d 193, 677 N.E.2d 733 (*"DeRolph I"*). In *DeRolph I,* we held that certain provisions of Ohio's elementary and secondary school-financing system then in effect violated Section 2, Article VI of the Ohio Constitution, which mandates a thorough and efficient system of common schools throughout the state. *Id.* at syllabus.

{¶ 71} On May 11, 2000, the court decided *DeRolph v. State* (2000), 89 Ohio St.3d 1, 728 N.E.2d 993 (*"DeRolph II"*). In *DeRolph II*, we held that the state's method of funding elementary and secondary schools drafted in response to our decision in *DeRolph I* fell short of providing for a thorough and efficient system of public schools throughout this state. *Id.* at 35-36, 728 N.E.2d at 1020. Further, we retained continuing jurisdiction over *DeRolph II* in order to provide the state additional time in which to comply with the constitutional requirements set forth in Section 2, Article VI. *Id.* at 38, 728 N.E.2d at 1022.

{¶ 72} Now before us is *DeRolph III*. The same issue under consideration in *DeRolph I* and *II* is again before this court. That issue is whether the current method of funding primary and secondary education in Ohio complies with Section 2, Article VI of the Ohio Constitution by providing a thorough and efficient system of common schools throughout the state. The Chief Justice has impressively set

forth the contents and structure of the legislation now before us. I concur in the well-reasoned decision of the majority that with the additional initiatives therein ordered, the state will have in place a statutory school-funding framework that withstands scrutiny under the Thorough and Efficient Clause of the Ohio Constitution as previously interpreted by this court in *DeRolph II.* I write further for the purpose of detailing several of the numerous issues that I and the other members of the court have examined throughout this litigation.

Separation of Powers

{¶ 73} Throughout the *DeRolph* litigation, we, as a court and individually, have been presented with an abundance of concerns. One of the primary concerns has been the doctrine of separation of powers. "Separation of powers" is a misnomer. There is no explicit declaration concerning separation of powers in either the federal Constitution or our state Constitution. Both Constitutions separate government into three branches while fusing certain functions and powers of those bodies. For instance, a president's or governor's veto protects the executive branch against legislative encroachments. The power of appointment protects the executive branch from judicial assault, and executive officers and administrative bodies exercise functions that belong to other departments. In addition, state and federal courts have the power to pass on the constitutionality of legislation, and federal judges are protected by life tenure. Further, although the courts do not legislate in the strict sense of the word, their decisions may be regarded from a realistic point of view as a form of lawmaking. Finally, the legislative branch controls the purse upon which the executive and judicial departments depend. Mason & Stephenson, American Constitutional Law: Introductory Essays and Selected Cases (8 Ed.1987) 76.

{¶ 74} The doctrine of separation of powers defines the very character of this country's political system of governance. Wood, The Creation of the American Republic 1776-1787 (1998 Ed.) 151. As James Madison explained in Federalist Paper No. 47, the sharing of powers through a system of checks and balances

complemented the principle of separation of powers by acting as an additional restraint on government. This blending of powers not only limits government itself, it also provides mechanisms by which each branch can defend its place in our constitutional system. The Federalist Papers No. 47 (Madison 1788) (Wills Ed.1982), at 243-246. See, also, Mason & Stephenson, American Constitutional Law, *supra*, at 76. Thus, the doctrine is viewed as serving a dual purpose. On one hand, it is said that "[t]he doctrine of the separation of powers was adopted by the convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power." *Myers v. United States* (1926), 272 U.S. 52, 293, 47 S.Ct. 21, 85, 71 L.Ed. 160, 242 (Brandeis, J., dissenting). On the other hand, the principle is construed as a facilitator of responsible governance. "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government." *Youngstown Sheet & Tube Co. v. Sawyer* (1952), 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153, 1199 (Jackson, J., concurring). See, also, Entin, Separation of Powers, The Political Branches, and the Limits of Judicial Review (1990), 51 Ohio St.L.J. 175. Thus, it is clear that the concept of the separation of powers is a political doctrine rather than a technical rule of law.

Meaning of the Separation-of-Powers Doctrine to the *DeRolph* Litigation

**{¶ 75}** The doctrine of separation of powers has played a paramount role throughout our history in ensuring that interbranch conflict never reaches a constitutional crisis. Conflicts between the three branches of government are inherent in our political system. Interbranch conflicts are "natural byproducts of the separation of powers principle." Hatch, Avoidance of Constitutional Conflicts (1987), 48 U.Pitt.L.Rev. 1025, 1027-1028. Thus, it is inevitable that conflicts will arise. The framers of the federal Constitution foresaw friction between the branches of government and sanctioned those conflicts as "the means of keeping each other

in their proper places." The Federalist Papers No. 51 (Madison 1788) (Wills Ed.1982), at 261.

{¶ 76} From a practical standpoint, the judicial branch is not the only branch of government that engages in constitutional interpretation. In this respect, the *DeRolph* litigation was sure to spawn conflict between the branches of government. "In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others." *United States v. Nixon* (1974), 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039, 1061. See, also, R.C. 1.47. Concerning *DeRolph*, interbranch conflict has existed not only between the judicial and legislative branches but also between the judicial and executive branches and between the General Assembly and the Governor. It is indeed unfortunate that some persons and segments of the print media have chosen to convert the *DeRolph* litigation into a contest between the General Assembly and the court, the court and the Governor, or, more recently, the General Assembly and the Governor. The litigation has not been about which branch of government is stronger, which branch would blink first, or which branch should be the dominant force. It is about the proper education and future of Ohio's 1,800,000 public schoolchildren and those generations of children who will follow. Obviously, at some point the questions before each of the branches of our government must be resolved—and this must be accomplished while preserving the independent role of each branch without the actual or perceived subjugation of one branch to another.

{¶ 77} That is not to suggest that we, as elected officials, should forgo our duties and responsibilities. All elected officials take an oath of office to uphold the Constitution. Section 7, Article XV, Ohio Constitution. See, also, Clause 3, Article VI, United States Constitution. Clearly, when a case is properly before the court for review and final determination, we as judges are not at liberty to ignore our obligations. "Under the long-standing doctrine of judicial review, it is our sworn

duty to determine whether the General Assembly has enacted legislation that is constitutional." *DeRolph,* 78 Ohio St.3d at 198, 677 N.E.2d at 737, citing *Marbury v. Madison* (1803), 5 U.S. (1 Cranch) 137, 2 L.Ed. 60. Deference to the corresponding branches of government does not mean abdication. See *United States v. Nixon*, 418 U.S. at 704-705, 94 S.Ct. at 3106, 41 L.Ed.2d at 1062 ("Notwithstanding the deference each branch must accord the others, the 'judicial Power of the United States' vested in the federal courts by Art. III, [Sec.] 1, of the Constitution can no more be shared with the Executive Branch than the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto. Any other conclusion would be contrary to the basic concept of separation of powers and the checks and balances that flow from the scheme of a tripartite government. The Federalist [Papers] No. 47, p. 313 [S. Mittell ed. 1938]"). Thus, the propriety of our review of this matter is well established and should no longer be under attack. The judicial branch is the final arbiter in interpreting the Constitution. *Marbury v. Madison* (1803), 5 U.S. (1 Cranch) 137, 2 L.Ed. 60. While it is the duty of the legislative branch to draft laws, it is the duty of the courts to say what the law is. *Id.* at 177, 2 L.Ed. at 73.

{¶ 78} While deference should be accorded each branch of government, we must all remember that the primary rationale behind the separation-of-powers doctrine is preservation of the public trust. The will of the people is of paramount concern, and special interests should not be allowed to prevail over public ones. The Federalist Papers No. 51 (Madison 1788) (Wills Ed. 1982), at 264.

{¶ 79} The will of the people in regard to public education has been declared by the citizens of this state through Section 2, Article VI of the Ohio Constitution. *Miller v. Korns* (1923), 107 Ohio St. 287, 297, 140 N.E. 773, 776. Accordingly, respect for separation of powers has led us to scrupulously avoid crafting a school-funding remedy in *DeRolph I* and *II*. Out of deference to the

General Assembly, as well as to the Governor, we have recognized that the scope of our review is limited to determining whether the funding method meets the educational mandate of the Ohio Constitution. We have indicated our belief that the crafting of a new funding formula is clearly a legislative function. Thus, we have previously declined to instruct the General Assembly regarding the specifics of the legislation that it should enact. *DeRolph I,* 78 Ohio St.3d at 212-213, 677 N.E.2d at 747. See, also, *DeRolph II,* 89 Ohio St.3d at 33-38, 728 N.E.2d at 1019-1022.

### Justice Cook's Dissent

{¶ 80} The dissent of Justice Cook criticizes the majority for "order[ing] the General Assembly to make specific changes that are 'required' before the current funding plan will be constitutional: adjusting the base cost formula and accelerating by two years the full funding of the 'parity aid program.' By ordering particular legislative action—based on its own concept of what is necessary to guarantee educational quality—the majority has made an initial policy determination that the judiciary is ill equipped to make and that is characteristic of nonjusticiability." With all due respect to the dissenter, the majority does no such thing.

{¶ 81} In *DeRolph I,* a majority of this court recognized that a school-financing system based on residual budgeting was flawed. *DeRolph I,* 78 Ohio St.3d at 199, 677 N.E.2d at 738. See, also, *id.* at 261, 677 N.E.2d at 780 (Resnick, J., concurring). We found that public education was then funded with the residue after other mandated government programs had been funded. *Id.* at 199, 677 N.E.2d at 738. Therefore, we indicated, the base cost of an adequate education as determined by the General Assembly had "no real relation to what it actually costs to educate a pupil" because, according to one expert, that amount was " 'a budgetary residual, which is determined as a result of working backwards through the state aid formula after the legislature determines the total dollars to be allocated to primary and secondary education.' " *Id.* We noted in *DeRolph I* that "[o]ur state Constitution was drafted

with the importance of education in mind" and that a formula that establishes the base cost of an adequate education after determining the total dollars to be allocated to primary and secondary education "contravenes the clear wording of our Constitution and the framers' intent." *Id.* at 209, 677 N.E.2d at 745.

{¶ 82} In *DeRolph II,* we commended the Governor and the General Assembly for recognizing that "education can no longer be funded as a residual in the state budget." *Id.,* 89 Ohio St.3d at 36, 728 N.E.2d at 1020. However, we noted that we could not totally discount evidence that residual budgeting methodology remained in the funding system under review therein. *Id.* at 19-20, 728 N.E.2d at 1008. Thus, we held that the "basic aid formula has structural deficiencies and *may not in fact reflect the amount required per pupil to provide an adequate education."* (Emphasis added.) *Id.* at 37, 728 N.E.2d at 1021.

{¶ 83} We are again faced with the same concerns, outlined in *DeRolph I* and *II,* regarding the basic aid amount. The General Assembly's determination of the basic aid amount has a substantial effect on the entire funding formula. Thus, the computation of the base cost per pupil of an adequate education is, in the words of expert witness Dr. Howard B. Fleeter, "a crucial step in defining the funding needs of the entire system."

{¶ 84} As indicated by the majority, the formula for determining the base cost of an adequate education is based on the average amount spent per pupil in fiscal year 1999 by "model" school districts. R.C. 3317.012. One hundred twenty-seven model school districts were used as a basis for calculating the base cost. The model school districts are those school districts that in fiscal year 1999 had met at least twenty out of the twenty-seven performance standards established in H.B. 94. See R.C. 3317.012(B)(1)(a) through (aa).[2] In order to arrive at the number of model school

---

2. The twenty-seven performance standards set forth in R.C. 3317.012(B)(1) are:
    "(a) A ninety per cent or higher graduation rate;
    "(b) At least seventy-five per cent of fourth graders proficient on the mathematics test prescribed under division (A)(1) of section 3301.0710 of the Revised Code;

"(c) At least seventy-five per cent of fourth graders proficient on the reading test prescribed under division (A)(1) of section 3301.0710 of the Revised Code;

"(d) At least seventy-five per cent of fourth graders proficient on the writing test prescribed under division (A)(1) of section 3301.0710 of the Revised Code;

"(e) At least seventy-five per cent of fourth graders proficient on the citizenship test prescribed under division (A)(1) of section 3301.0710 of the Revised Code;

"(f) At least seventy-five per cent of fourth graders proficient on the science test prescribed under division (A)(1) of section 3301.0710 of the Revised Code;

"(g) At least seventy-five per cent of sixth graders proficient on the mathematics test prescribed under division (A)(2) of section 3301.0710 of the Revised Code;

"(h) At least seventy-five per cent of sixth graders proficient on the reading test prescribed under division (A)(2) of section 3301.0710 of the Revised Code;

"(i) At least seventy-five per cent of sixth graders proficient on the writing test prescribed under division (A)(2) of section 3301.0710 of the Revised Code;

"(j) At least seventy-five per cent of sixth graders proficient on the citizenship test prescribed under division (A)(2) of section 3301.0710 of the Revised Code;

"(k) At least seventy-five per cent of sixth graders proficient on the science test prescribed under division (A)(2) of section 3301.0710 of the Revised Code;

"(l) At least seventy-five per cent of ninth graders proficient on the mathematics test prescribed under Section 4 of Am. Sub. S.B. 55 of the 122nd general assembly;

"(m) At least seventy-five per cent of ninth graders proficient on the reading test prescribed under Section 4 of Am. Sub. S.B. 55 of the 122nd general assembly;

"(n) At least seventy-five per cent of ninth graders proficient on the writing test prescribed under Section 4 of Am. Sub. S.B. 55 of the 122nd general assembly;

"(o) At least seventy-five per cent of ninth graders proficient on the citizenship test prescribed under Section 4 of Am. Sub. S.B. 55 of the 122nd general assembly;

"(p) At least seventy-five per cent of ninth graders proficient on the science test prescribed under Section 4 of Am. Sub. S.B. 55 of the 122nd general assembly;

"(q) At least eighty-five per cent of tenth graders proficient on the mathematics test prescribed under Section 4 of Am. Sub. S.B. 55 of the 122nd general assembly;

"(r) At least eighty-five per cent of tenth graders proficient on the reading test prescribed under Section 4 of Am. Sub. S.B. 55 of the 122nd general assembly;

"(s) At least eighty-five per cent of tenth graders proficient on the writing test prescribed under Section 4 of Am. Sub. S.B. 55 of the 122nd general assembly;

"(t) At least eighty-five per cent of tenth graders proficient on the citizenship test prescribed under Section 4 of Am. Sub. S.B. 55 of the 122nd general assembly;

"(u) At least eighty-five per cent of tenth graders proficient on the science test prescribed under Section 4 of Am. Sub. S.B. 55 of the 122nd general assembly;

"(v) At least sixty per cent of twelfth graders proficient on the mathematics test prescribed under division (A)(3) of section 3301.0710 of the Revised Code;

"(w) At least sixty per cent of twelfth graders proficient on the reading test prescribed under division (A)(3) of section 3301.0710 of the Revised Code;

"(x) At least sixty per cent of twelfth graders proficient on the writing test prescribed under division (A)(3) of section 3301.0710 of the Revised Code;

"(y) At least sixty per cent of twelfth graders proficient on the citizenship test prescribed under division (A)(3) of section 3301.0710 of the Revised Code;

"(z) At least sixty per cent of twelfth graders proficient on the science test prescribed under division (A)(3) of section 3301.0710 of the Revised Code;

districts used in the base cost formula, the General Assembly introduced two factors into the formula.

{¶ 85} R.C. 3317.012(B)(1) contains a rounding provision that permits the inclusion of school districts that did not meet at least twenty of the twenty-seven academic performance standards. Thus, seven school districts that had achieved only eighteen or nineteen performance measures were included as model districts for the purposes of calculating the base cost amount. The result was a reduction in the base cost in the amount of $40 per student for fiscal year 2002. After reviewing this aspect of the school-funding plan, Dr. Fleeter remarked:

"It is difficult to conclude that the addition of these marginally unsuccessful districts to the list of successful districts occurred for any reason other than the reduction of the total per pupil cost of an adequate education."

{¶ 86} A second factor, income and property wealth screens, was also used in determining the model school districts to be included in the base cost foundation formula. The income screen excludes from consideration of the base cost calculation those districts that were among the five percent of all districts with the highest income and those districts that were among the five percent of all districts with the lowest income. R.C. 3317.012(B)(2). Likewise, the property wealth screen excludes from consideration those districts that were among the five percent of all districts with the highest property valuation per pupil and those districts that were among the five percent of all districts with the lowest property valuation per pupil. R.C. 3317.012(B)(3). Previously the funding formula had excluded the top and bottom ten percent of all districts. This change, to a five-percent wealth screen, allows inclusion of additional successful districts with higher wealth. However, wealth screening still excludes some two-thirds of the thirty most effective performing school districts in the state.

---

"(aa) An attendance rate for the year of at least ninety-three per cent as defined in section 3302.01 of the Revised Code."

**{¶ 87}** In its brief, the state justified the removal of these districts from the calculation of the base cost by quoting David Monk, the Dean of the College of Education at Pennsylvania State University. He described Dr. John Augenblick's original recommendation by stating:

" 'A 5% exclusion of this kind is a well established practice within the field of school finance given the common existence of highly atypical school districts in the tails of wealth and income distributions.' "

**{¶ 88}** However, we agree with plaintiffs' argument that the income and property wealth screens were implemented "solely to eliminate high wealth districts, since no district at the bottom of the wealth spectrum satisfied the 20 out of 27 performance standards, while most of the districts on the high end of the wealth spectrum easily surpassed the 20 of 27 benchmark." The result was that, through the introduction of wealth screens, the state was able to reduce the basic aid amount by $110 per pupil.

**{¶ 89}** The state used a third and, for our purposes, final procedure for calculating the base cost amount. This method is set forth in the last paragraph of R.C. 3317.012(B) and is referred to as the "echo effect" provision. For those school districts that qualified as model districts in FY99 and that had also met the required performance criteria of the statute in effect in FY96, R.C. 3317.012(B) provides that the base cost is calculated from the expenditures per pupil for those districts in FY96 or FY99, whichever year is lower.[3] The rationale behind this provision, as stated in the statute, was that "the increased state funding may have driven the districts' expenditures beyond the expenditures that were actually needed to maintain their educational programs at the level necessary to maintain their ability to meet the fiscal year 1999 performance criteria of current division (B)(1) of this section."

**{¶ 90}** However, as noted by Dr. Fleeter:

---

3. The 1996 figures were adjusted for inflation.

"In general, the Echo effect adjustment totally ignores the contribution made by local taxes to the base cost amount. The data show that local revenue increases accounted for more of the total dollar increase than that for which State aid accounted. * * *

"By assuming that State aid *may* have caused districts to exceed the amount needed to fund an adequate education, the General Assembly also tacitly assumes the voters in those districts undertook $112 million in additional tax burden unnecessarily. This assumption has no support in any empirical data." (Emphasis *sic.*)

{¶ 91} With the introduction of an "echo effect" provision, the General Assembly reduced the per-pupil basic aid figure by $181.

{¶ 92} It is obvious from the foregoing that those provisions discussed above, rounding, wealth screens, and "echo effect," violate the Thorough and Efficient Clause set forth in Section 2, Article VI of the Ohio Constitution. Those provisions have "no real relation to what it actually costs to educate a pupil." *DeRolph I,* 78 Ohio St.3d at 199, 677 N.E.2d at 738. Simply stated, those provisions were inserted into HB 94 as residual, cost-based budgeting methods designed to do nothing more than lower the basic aid amount to a figure that is palatable to the General Assembly.

{¶ 93} This court has the power and the duty to sever those provisions of legislation that offend the dictates set forth in our Ohio Constitution. The General Assembly acknowledges this power in stating legislative intent in R.C. 1.50:

"If any provision of a section of the Revised Code or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision or application, and to this end the provisions are severable."

{¶ 94} The test for determining whether an unconstitutional provision may be severable is set forth in *Geiger v. Geiger* (1927), 117 Ohio St. 451, 466, 160 N.E. 28, 33:

" '(1) Are the constitutional and the unconstitutional parts capable of separation so that each may be read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?' " *Id.,* quoting *State v. Bickford* (1914), 28 N.D. 36, 147 N.W. 407, paragraph nineteen of the syllabus.

{¶ 95} Those offending provisions, the last paragraph of R.C. 3317.012(B)(1) (rounding), R.C. 3317.012(B)(2) and (3) (wealth screens), and the last paragraph of R.C. 3317.012(B) (echo effect), and the remaining, unoffending sections of HB 94 may each be read, and each may stand, by itself. Further, the unconstitutional provisions are not so essentially connected with the remainder of HB 94 that by eliminating those provisions the enactment will lose its intent. Therefore, we need only excise the constitutionally offensive sections and need not add any other language to give effect to its remedial scheme. Thus modified, the remainder of HB 94 continues to give effect to the intent of the General Assembly, which is, of course, to provide a thorough and efficient system of funding for public education.

{¶ 96} Similarly, the majority has also found it necessary to sever that provision of the state's parity aid program requiring a phase-in of the program in full by FY06. R.C. 3317.0217(C) and (D). We have previously voiced our concern regarding the General Assembly's practice of phasing in certain parts of the school-funding formula. *DeRolph II*, 89 Ohio St.3d at 18-19, 728 N.E.2d at 1007 (phase-in aspect of basic aid amount). In response to the phasing-in of parity aid, Dr. Fleeter noted:

"The fact that Sub. H.B. 94 would phase-in Parity aid in incremental steps further undermines the ability of the new program to achieve systematic reform. Parity aid amounts to the major element of the legislation intended to address the unconstitutional overreliance on the local property tax in Ohio's school funding system. In this context, Parity aid offers the prospect of alleviating a small part of that overreliance initially. 'Full' relief would require five years to achieve."

{¶ 97} Without striking the phase-in provision from R.C. 3317.0217(C) and (D), the legislation drafted by the General Assembly in response to *DeRolph I* and *II* will not meet the mandate of a thorough and efficient system set forth in Section 2, Article VI of the Ohio Constitution.

{¶ 98} Therefore, contrary to Justice Cook's belief, the majority is not thrusting itself into the legislative arena. Nor is the majority by severing those offending portions of HB 94 making public policy determinations reserved for the General Assembly. Our actions are not in disregard of the doctrine of separation of powers or offensive to our constitutional form of government. We are not imposing our will on the General Assembly or the people of this great state. We are merely performing our sworn duty of determining "whether the General Assembly has enacted legislation that is constitutional." *DeRolph I,* 78 Ohio St.3d at 198, 677 N.E.2d at 737.

Options

{¶ 99} It is important to review what options this court had before it while deciding *DeRolph III*. As in every case, before finally deciding what decision the court is to make, the question that must always be asked is, what will be the next step and the step after that?

A. Approve the New Legislation

{¶ 100} The court could simply approve the legislation and walk away. Without severing those offending portions as ordered in the Chief Justice's majority opinion, this option lacked credibility and was never supported by a court majority.

B. Declare the New Legislation Unconstitutional and Do Nothing Else

{¶ 101} Assume, as some will forcefully argue, that the funding formula enacted by the General Assembly and signed by the Governor fails to pass constitutional muster and a majority of the court simply declares it unconstitutional. This option presents at least two problems. If a majority of the court would say to the General Assembly and the Governor, "Try again," what would that mean? Merely declaring the statutes unconstitutional and returning the matter to the General Assembly, without more detailed and specific direction would appear to be an act of futility. Only one member of this court was willing to take this step. It would leave the existing paralysis without treatment.

{¶ 102} The second problem could be even more acute. If the court were to say that the legislation is unconstitutional, then, arguably, there would be a return to pre-existing funding levels. Such an action would, by the state's calculations, return to the state's general fund the $1,400,000,000[4] appropriated by the General Assembly

---

4. It has been widely reported by the Governor and the General Assembly that with the enactment of HB 94, an additional $1.4 billion has been budgeted to fund primary and secondary education. However, despite the exuberance of these sources, I am at a loss to confirm their calculations, especially when the state's brief fails to cite such an enormous figure. At most, the state argues in its brief that the current basic aid figure of $4,814 is an increase of twelve percent per student in 2001. Apparently, the state is referring to the increase of $520 between the FY01 $4,294 figure of HB 650, and the current FY02 figure of $4,814. Yet, the state fails to credit the level at which HB 650 would have funded the FY02 budget, which would have been $4,414. Thus, the increase would be only nine percent or $400 per pupil.

In addition, the state fails to reconcile its claims with the fact that it has reduced the maximum cost-of-doing-business factor from eighteen percent to 7.5 percent, further eroding the enormous gains it purports to fund. In fact, and by example, Hamilton County under HB 650 would have received $5,084 per pupil, yet with the reduction in the cost-of-doing-business factor under HB 94, Hamilton County will actually receive $5,175. Thus, after the reduction in the cost-of-doing-business factor, the $520 base cost increase trumpeted by the state yields a meager $91 gain for Hamilton County over what it would have received under HB 650. Other counties face similar circumstances.

While this court does not set legislative policy, I do find it curious that in 1995 the legislature allowed a maximum cost-of-doing-business factor of 7.5 percent. Former R.C. 3317.02(E), 1995 Am.Sub.H.B. No. 117, 146 Ohio Laws, Part I, 1203. But realizing that cost disparities between some counties were as much as thirty-six percent, the legislature, through the enactment of HB 215, decided to phase in an increase to a maximum of eighteen percent to offset the disparity. Former R.C. 3317.02(E)(2), 147 Ohio Laws, Part I, 1214. Yet here we are, but four

to finance the plan now before us. These funds would then presumably be reallocated to the other state institutions and programs so severely cut to accommodate the school-funding plan. While one or more of us would welcome the return of support for higher education, mental health, protection of battered women, prison security, payment of wrongfully withheld child support, and other worthwhile and needed state responsibilities, the negative practical effect of such an action outweighs the benefits.

{¶ 103} Each school district in this state presumably already has a budget for at least the coming year. If we were to reject the plan before us, over the course of the next biennium the Cleveland Municipal School District would lose almost $34,000,000. The Columbus City School District would lose over $33,000,000. Toledo City School District would lose $19,679,912. South-Western City in Franklin County would lose over $17,000,000; Lakota Local in Butler County almost $13,000,000; Akron City, over $12,000,000; Ohio Valley Local, $9,500,000; Hilliard City, $8,700,000; Canton City, $7,384,424. Lorain City, Dayton City, Mason City in Warren County, Pickerington Local in Fairfield County, Parma City, Euclid City, and Dublin City would each lose between $9,500,000 and $6,700,000.

{¶ 104} Benton Carroll Salem Local in Ottawa County would lose over the biennium an increase of one hundred ninety-one percent; Wolf Creek Local in Washington County, one hundred seventy-seven percent; River View Local in Coshocton County, one hundred fifty-three percent; Three Rivers Local in Hamilton County, one hundred forty-five percent; College Corner Local in Preble County, one hundred thirty-four percent; Edison Local in Jefferson County, one

---

years later, and the legislature has decided to revert to the 7.5 percent maximum. Moreover, the 7.5 percent maximum that is reinstated in HB 94 does not assign the same cost-of-doing-business factors to the various counties as were assigned prior to HB 650. In fact, fifty-five of eighty-eight counties have been assigned lower cost-of-doing-business factors. In the words of Dr. Fleeter, one of the experts in this case, "One can only conclude that the driving force behind this change is either the desire to transfer state aid from urban areas to rural areas or simply the desire to seemingly increase the foundation level without paying the full price for doing so."

hundred fourteen percent; Avon Lake City in Lorain County, one hundred eleven percent; and Woodridge Local in Summit County, ninety-seven percent. The list goes on and on, but the increases provided by the plan (and the additional funds to be made available by the court's majority opinion of today) are truly significant. Gallia County School District in Gallia County will receive over the two-year period an increase from $5,864,774 to $10,686,054, and all of these dollar figures and percentages are calculated *before* the additions that will accrue to each district after the majority opinion is fully carried out.

{¶ 105} If a majority of the court would say that not enough has yet been done and the Governor, the General Assembly, and the court study the matter again for a year or two, it is fair to ask, how long would it take, even if there was a new acceptable plan, to make up what each district would lose during the study/discussion period? Answering our own question, there is not a court majority willing to risk losing what has already been gained.

{¶ 106} The option of merely declaring the legislation unconstitutional and allowing the General Assembly to enact yet another plan is not viable.

C. Special Master or Commission

{¶ 107} Appointment of a special master or commission has been discussed. There has been little or no support for a single special master. Appointment of an independent five-member blue ribbon commission composed of members with specific expertise in law, finance, taxation, educational excellence, and labor relations, for the purpose of developing a plan that meets the requirements of both *DeRolph I* and *DeRolph II* and then submitting it to the court for consideration and a possible order to enact it, has been seriously considered and has engendered greater support among us. This idea has failed because, as a former justice of this court was fond of saying during my early tenure on the court, "The name of the game is four." Only three members of the court supported this option. There were never four votes for this approach.

## D. Contempt

**{¶ 108}** Contempt has been a widely discussed option but, I hasten to forcefully and unequivocally state, *never* within the court itself. As this is being written, I just received a call from a man identifying himself as being from Carroll County. His message was the same as various members of the court have received over the last four years. "Don't cave in to the General Assembly. Find them in contempt and put them in jail."

**{¶ 109}** While that option has never been seriously discussed among us, let us explore that option for the benefit of those who would advocate such a malevolent course of action. Admittedly, if the General Assembly had failed to comply with the prior court orders and craft a funding formula that passes constitutional muster, this court (like other courts) is vested with the power to enforce its orders. But how? Enforcement of any court order poses concerns. The judicial branch has no concrete powers like the sword (executive) or the purse (legislative) with which to carry its judgments into effect. Paulsen, The Most Dangerous Branch: Executive Power to Say What the Law Is (1994), 83 Geo.L.J. 217, 219. In fact, the judicial branch has been referred to as the "least dangerous" branch of government. The Federalist Papers No. 78 (Hamilton 1788) (Wills Ed.1982), at 393. Courts do not possess their own army or a police department to enforce their orders and judgments. Instead, as Hamilton observed, the judiciary is dependent upon the executive department for the efficacy of its judgments. *Id*. at 393-394. See, also, Paulsen, 83 Geo.L.J. at 219.

**{¶ 110}** These practical problems of enforcement remain the same, and are, in fact, exacerbated because today we live in different times. We hear from certain members of the General Assembly that we can say whatever we want but those pronouncements will be ignored. We hear some members of the General Assembly saying that impeachment of one or more justices might be in order and, in fact, we have one self-proclaimed constitutional law expert, a professor, advocating our

impeachment or removal from office and stating that the General Assembly has a duty to ignore court orders that he says we have no right to issue, notwithstanding that we are doing what we believe the oath means when we swear "to support the constitution of the United States and the constitution of this state" and "to administer justice without respect to persons." R.C. 3.23.

{¶ 111} Are we afraid? No. We fear not for ourselves but for those who would forget their place in our constitutional system of governance and ignore the wisdom of our founding fathers. Are we practical? Yes. We recognize that we have no army and no police force to send. We have only our ability to reason, persuade, and even plead with the Governor and General Assembly to do what is right and best for schoolchildren in Ohio.

E. Possible Solutions to Funding Inadequacies

{¶ 112} We have been criticized, sometimes by the very same people, both for entering the fray at all and for not spelling out exactly "what you want us to do." We recognize this "can't win" position, but a few comments may now be in order. There have now been a legion of challenges in various states to the funding of public education. To date, courts in seventeen states have found their public education financing systems to be unconstitutional. Lundberg, State Courts and School Funding: A Fifty-State Analysis (2000), 63 Alb.L.Rev. 1101. These holdings have been based on state constitutional language the same as or similar to our own. What we have done is hardly an aberration.

{¶ 113} Certainly Ohio's schoolchildren are better off today than they were before *DeRolph I* and *DeRolph II*. New facilities have been and are being constructed. Learning materials, including books, have been updated and replaced. Student-teacher ratios have been decreased. Technology has been introduced and improved. We recognize that more must be done, but the impetus is now at work. With the basic plan and the additional provisions spelled out in the majority opinion and under the prodding and capable leadership of the Governor, the General

Assembly, the Ohio Coalition for Equity and Adequacy of School Funding, and this court have gone a long way toward rectifying school funding inadequacies. Is the solution perfect? No. Is the solution adequate? I hope so. The constitutional mandate is one of adequacy—not equality.

Other States

{¶ 114} It would have been appropriate for the Governor and the General Assembly to have drawn on the experiences of other states to solve what, by any fair observer's review, has been a problem in our state for a very long time—inadequate funding of public education and decrepit school buildings (a 1996 United States General Accounting Office report points out that ninety-five percent of Ohio's school buildings need upgrades and repairs [U.S. GAO Report No. HEHS-96-148 "School Facilities: Profiles of School Condition by State"]). We hope that the Governor and General Assembly will look further at the problem and draw on the experiences of such states as Kentucky and Vermont. In fact, we would do well to study, and perhaps emulate, the strategy employed by our sister states of Michigan and Minnesota in solving their school-funding inadequacies.

{¶ 115} In his recent book, The DeRolph Case: Ohio's Struggle for a Constitutional School Finance System (2001), Professor Richard Lucier, a Denison University economics professor, makes the point and specifically details the Michigan experience. *Id.* at 159-171. Admittedly, the initiative was bold, the medicine distasteful, and political futures uncertain. But with strong and imaginative gubernatorial and legislative bipartisan leadership, Michigan's leaders and its citizens struck a strong blow not only for schoolchildren but also themselves. In doing so, the Michigan plan relieved the heavy burden on overtaxed owners of real estate, many of whom were property holders trying to reconcile what had become an oppressive burden of trying to do what was right—support local schools—with what was financially feasible. But it was not just homeowners who

benefited. After all, commercial and industrial real property is also taxed, and these business interests also benefited.

**{¶ 116}** In 1993, Governor John Engler and Michigan legislative leaders jointly supported a constitutional amendment designed to reduce local property taxes by nearly fifty percent and to replace the lost property tax revenue for schools by a corresponding state sales tax increase—a method not unfamiliar to Ohio voters. *Id.* at 159. The amendment was defeated by Michigan voters by a margin of fifty-five percent to forty-five percent. *Id.* at 159-160. Governor Engler's proposal included a state foundation grant of $4,800 per pupil—in 1993! *Id.* at 163. Today, some eight years later, our base figure in Ohio is $4,814 for FY02. Michigan's number for FY02 is $6,300. Mich.Comp.Laws Ann. 388.1620.

**{¶ 117}** In any event, Governor Engler and the members of the General Assembly in Michigan were not willing to accept the 1993 defeat. *Id.* at 160. The minority leader of the senate, State Senator (and now United States Senator) Debbie Stabenow, a Democrat, introduced legislation that, if approved, would entirely eliminate local property taxes as a source of revenue for public education. The legislature did not dilly-dally. Within twenty-four hours the legislation was approved by a vote in the state senate of twenty-nine to five and in the house by a vote of sixty-nine to thirty-five. *Id.* at 160 and fn. 6. In August 1993, Governor Engler signed the bill, and the massive tax cut, $6.5 billion, became reality. *Id.* at 159. Suddenly, local property taxes for school funding were reduced to zero. *Id.* With two-thirds of the funding for primary and secondary education eliminated and no provision to replace the lost revenue, decision time was at hand. *Id.*

**{¶ 118}** The Michigan General Assembly responded with courage and dispatch. Two plans for reform were adopted. *Id.* at 163. The first was a ballot proposal. It proposed a constitutional amendment increasing the state sales tax in an amount that would, if approved, provide $10.2 billion in combined state-local revenue and, thereby, completely change forever the method by which public

education in Michigan is financed. No longer would there have to be an overreliance on local real estate taxes to fund the educational system. The other plan, a statutory plan, would automatically take effect if voters rejected the sales tax plan. That legislation, already approved and in place, provided for the replacement of most of the local property tax cuts with increased state income taxes if the ballot plan failed. *Id.*

{¶ 119} On March 15, 1994, the voters of Michigan, having had a complete and comprehensive program submitted to them, overwhelmingly approved the ballot sales tax plan by sixty-nine to thirty-one percent. *Id.* at 165. The referendum was on the ballot in a primary election in a nonpresidential year, yet the voter turnout was forty-one percent, a substantial response by the Michigan electorate. *Id.* at 165, fn. 23. With one master stroke, and admirable gubernatorial and legislative intestinal fortitude, local property tax revenue funding had been reduced to about twenty percent of the total of school funding with the state's share and the sales tax making up the other eighty percent of the school funding revenue.

{¶ 120} Minnesota's experience in solving its public school financing crisis is also worthy of comprehensive review. However, rather than detail that story, I attach as an appendix the well-reasoned and well-presented column by Chris Sheridan, associate editor of the Plain Dealer's editorial pages. According to the column, the average per-pupil spending from the state (Minnesota) for 2001-2002 "will amount to nearly $6,900." (See ftp://ftp.sconet.state.oh.us \opinions/2001/governor.pdf.)

{¶ 121} Some members of this court wish that we in Ohio could have gotten together on a plan the same as or similar to those enacted in Michigan and Minnesota. We recognize that "hope springs eternal in the human breast." Maybe yet there will be a brave soul or two who will step forward to propose that we overhaul the system so that instead of just tweaking what we have, real and substantial reform takes place and the systematic overhaul so eloquently called for

by Justice Sweeney in *DeRolph I* takes place. Illustrative of the seriousness of the overall problem is the article from the Wall Street Journal of July 18, 2001, which is appended hereto. (See ftp://ftp.sconet.state.oh.us\opinions/2001/wsj.pdf.) I hurt for my hometown, Toledo, and all the many other Ohio communities that find themselves in like circumstances. Unfortunately, what the article depicts is the rule—not the exception!

Conclusion

{¶ 122} After reviewing the specific options set forth above and a number of other alternatives not listed, we realized that each option was not practical or could not attract a majority vote of the court. Recognizing that it is the primary mission of this court to accept cases that properly invoke its jurisdiction under the Constitution, read briefs and hear arguments on those cases, decide the cases, and then publish opinions to assist the bench, bar, and litigants of this state, a majority of the court came to today's conclusion knowing that a two-two-two-one or a three-three-one or any other combination of votes short of a majority of four would not be meeting our constitutional obligations.

{¶ 123} Certain members of the majority had to forgo their argument on lack of jurisdiction. Other members of the majority had to overcome the feeling that what has been presented to the court is nothing more than a massaging of the system, that is, the funding legislation before us still looks like, walks like and quacks like, and, therefore, is still residual budgeting; that under the plan the school facilities problems will not be taken care of during the lifetime of a now middle-aged person; that the overreliance on local property taxes for educational funding has not really been solved for the long run and that there has not been a "complete, systematic overhaul" of the educational funding system for students in the K-12 grades called for in *DeRolph I. Id*., 78 Ohio St.3d at 212, 677 N.E.2d at 747. Finally, one member of the majority had to forgo insisting that in Ohio, education is a fundamental right.

{¶ 124} Once these chasms had been closed the more obvious problems that could not be ignored could be met head on. Thus, today we hold that to meet the constitutional requirements of Section 2, Article VI of the Ohio Constitution that there be a thorough and efficient system of common schools throughout the state, the so-called echo-effect adjustment must be eliminated, the rounding-up procedure cannot be used, and the income and property wealth screens must be removed when determining the base cost of an adequate education. In addition, the current phase-in aspect of the parity aid program, which is repugnant to a thorough and efficient system of public education, is eliminated. Finally, we urge that the Governor and General Assembly look at other ways and means to resolve the facilities problems that face almost every school district in our state.

{¶ 125} State Senator Jeff Jacobson is widely recognized as the architect of the plan now before us. At a press briefing on Thursday, April 12, 2001, he said, "I think that the court was right in what they did in *DeRolph I* and *II*." *Sunny Senators*, *http://www.capitolgate.com/OH/pressroom/leadstory.asp?id=35*. (or see ftp://ftp.sconet.state.oh.us\opinions/2001/senators.pdf.) More recently, on Friday, July 27, 2001, the Senator said, "[I]f you read their decision [*DeRolph I* and *DeRolph II*], it was a very moderate decision. It was very wise. It was not the type of decision that would lead by itself to a constitutional crisis and yet that's the way many people treated it." *Holding Out Hope*, *http://www.capitolgate.com/OH/pressroom/leadstory.asp?id=109*. (or see ftp://ftp.sconet.state.oh.us\opinions/2001/hope.pdf.) Certainly Senator Jacobson has never been known as some wild-eyed liberal, and these comments of his, in his capacity as a father, a state senator, and a lawyer, should lay to rest the notion that the court did something wrong in accepting jurisdiction over a legitimate case or controversy with constitutional ramifications. It is not as if we went out to the corner of Broad and High in Columbus and engaged in champerty. We did not ask for the case, but when such a case arrives here it is our sworn obligation to resolve

it based on the law, the facts, and our own personal oaths with regard to interpreting and supporting our Ohio Constitution. We do not have any subcommittee to refer the matter to for purposes of letting it die. We decide it as we must and should.

{¶ 126} The new majority finds that, once modified, the legislation will meet the required constitutional standard. That is, the legislation will then not be unconstitutional beyond a reasonable doubt. *State ex rel. Dickman v. Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59, paragraph one of the syllabus.

{¶ 127} To some, we will have done too much. To others, we will have fallen woefully short of the ultimate goal. To those of us in the majority, we will have seen our duty and discharged it in a manner consistent with our sworn obligations.

{¶ 128} In 1776, when John Adams was traveling to Philadelphia from his home in Massachusetts to participate in the major issue of his day—the independence of the Colonies—his wife, Abigail Adams, wrote to him. She said: "You cannot be, I know, nor do I wish to see you, an inactive spectator. * * * We have too many high sounding words, and too few actions that correspond with them." McCullough, John Adams (2001) 21.

{¶ 129} We entered into this enterprise knowing that our actions, whatever we might do or not do, would be subject to much commentary, review, and criticism. We could not and would not, however, be inactive spectators uttering high-sounding words without corresponding actions.

{¶ 130} Accordingly, I concur. In concurring, I understand that it is the intention of the majority that the General Assembly will, within a reasonable period of time, make the changes set forth in the majority opinion. If the General Assembly does not comply, any aggrieved party can return to us by reinvoking our jurisdiction. See *Harris v. Harris* (1979), 58 Ohio St.2d 303, 307, 12 O.O.3d 291, 293, 390 N.E.2d 789, 792. In that event, a more comprehensive order could very well be entered, and

we, having gone the extra mile, would seek enforcement of that order through means available to the court.

{¶ 131} I respectfully concur.

PFEIFER, J., concurs in the foregoing concurring opinion.

———————————

**PFEIFER, J., concurring.**

{¶ 132} I concur in Chief Justice Moyer's majority opinion and join the concurring opinion of Justice Douglas. H.B. 94, fully funded, will "smooth out the unconscionable funding inequities that exist between school districts in this state." *DeRolph v. State* (1997), 78 Ohio St.3d 193, 262, 677 N.E.2d 733, 780 (Pfeifer, J., concurring). Although Ohio's school-funding scheme has thus been made constitutional, it is legitimate to observe that the system continues to rely heavily on local property taxes. That concern could be eased by rethinking the issue of funding for school buildings.

{¶ 133} The General Assembly has adopted a plan to build new classrooms and rehabilitate existing classrooms in this state. If the Governor and General Assembly were to ask Ohio voters to approve an expansion of the state's debt authority for the single purpose of funding one hundred percent of school construction and repair, it would be an enormous boost to educational opportunity across this state. It would also serve the collateral purpose of substantially reducing the system's reliance on local property taxes.

{¶ 134} Well-built and well-kept school buildings say something to the children who are in them now and say something to future generations. School buildings are tangible evidence that we cared, that we saw an opportunity to help our children, and that we accepted our responsibility to do so. The General Assembly has reached for and achieved a constitutional system of common schools. There is room to reach higher.

———————————

**LUNDBERG STRATTON, J., concurring.**

{¶ 135} I respectfully concur in the judgment of the majority. I write simply to clarify that I still adhere to my position outlined in the dissents in *DeRolph I* and *II*, and still believe that the "Constitution requires the *General Assembly* to 'make such provisions, by taxation or otherwise, as * * * will secure a thorough and efficient system of common schools throughout the state.' " (Emphasis added.) *DeRolph v. State* (1997), 78 Ohio St.3d 193, 264, 677 N.E.2d 733, 782 (Moyer, C.J., dissenting), quoting Section 2, Article VI, Ohio Constitution.

{¶ 136} The law, as recently amended by the General Assembly, increases school funding by millions of dollars and has dramatically increased funding in many areas. These changes, along with modifications ordered in this majority opinion, persuaded two justices from the former majority to find that the school-funding plan is constitutional. Had I continued to dissent, the gridlock in this case would have continued to the detriment of all the parties, including most importantly Ohio's schoolchildren. Thus, my vote to join the majority is not an implicit finding that the former plan was unconstitutional, but is rather a pragmatic compromise to resolve an impasse that I believe has been divisive for too long and for which the alternatives proposed by the dissents are truly unacceptable. Therefore, I respectfully concur.

———————————

**ALICE ROBIE RESNICK, J., dissenting.**

{¶ 137} In its Machiavellian maneuver to halt this litigation, the majority gives its seal of approval to a system of public education that, even with the judicially legislated adjustments of the majority, falls well short of the system required by the Ohio Constitution. In doing so, a majority of this court abandons adherence to the requirements of the Ohio Constitution and puts an end to this litigation, even while recognizing that the General Assembly's enactments are unsatisfactory. It is indeed ironic that one thing all the justices (both in the majority

and in dissent) of this court agreed on in both *DeRolph v. State* (1997), 78 Ohio St.3d 193, 677 N.E.2d 733 ("*DeRolph I*"), and *DeRolph v. State* (2000), 89 Ohio St.3d 1, 728 N.E.2d 993 ("*DeRolph II*"), was that it was the General Assembly's task, not that of this court, to enact school-funding legislation. Now, a majority of this court has determined that, for the sake of expediency, harmony, and consensus, it is acceptable for this court to sit as a superlegislature and enact its own version of a constitutionally acceptable school-funding plan. The majority states:

"A climate of legal, financial, and political uncertainty concerning Ohio's school-funding system has prevailed at least since this court accepted jurisdiction of the case. We have concluded that no one is served by continued uncertainty and fractious debate. In that spirit, we have created the consensus that should terminate the role of this court in the dispute."

{¶ 138} The majority's creation of this consensus provides an uncertain future for the children and citizens of Ohio for two reasons. The first, of course, is that this court has no authority to order the level of spending or impose other specific requirements that would make the state's system of funding education constitutional. The second is that the General Assembly must accept the majority's judicial mandates and enact legislation that complies with this court's order. Judging by past history, when will that take place?

{¶ 139} The defendants have once again resisted as too politically unpopular the fundamental changes required to bring our public school system into compliance with the Constitution. Instead, the defendants have merely tweaked the system that was rejected by this court in two previous decisions. They have stamped "new and improved" on a system that is neither, and have trumpeted that this "revised" system, with a supposed massive infusion of cash provided by the state, satisfies the Constitution. However, it takes much more than money to accomplish the systematic overhaul of school funding in Ohio that a majority of

51

this court in *DeRolph I* and *DeRolph II* recognized was required to bring the system into compliance with our Constitution.

{¶ 140} Even today's majority cannot accept the state's transparent, self-serving, and expedient portrayal of its inadequate response without judicially legislating its own amendments in order to arrive at a "constitutional" funding system. The majority has acquiesced to the desires of the defendants, and has abandoned all pretense of objectivity, ostensibly in the spirit of creating a consensus. The majority appears to be working hand in hand with the legislative branch of government when it quotes Thomas Jefferson as support for its decision to impose a compromise in this case for "the greater good." Jefferson was a wise man, but he was certainly not discussing the function of a supreme court when he wrote of "sacrificing our opinions sometimes to the opinions of others for the sake of harmony." The oath of a Supreme Court justice is to "administer justice without respect to persons." R.C. 3.23. Nowhere in that oath is there any recognition of an overriding necessity of harmonious decisions for the sake of getting along with the other branches of government or of creating a "consensus" among the members of the court.

{¶ 141} The role of the Supreme Court is to act independently from the other two branches of government in determining whether the laws as enacted by the General Assembly pass constitutional muster. We are not members of the legislature, where compromise is the order of the day and backroom deals are taken for granted. Rather, we have taken a sacred oath to support and uphold the Constitution to the best of our ability and understanding.

{¶ 142} The majority apparently recognizes that the state's plan is too flawed to meet the goals illuminated by two previous decisions of this court. However, rather than giving the state additional time to enact a constitutional system, the majority, "for the sake of harmony," does its own toying with the system, adding its own layer of legislation to that enacted by the General Assembly. The majority's determination that the state must revise its calculations to increase Am.Sub.H.B. No. 94's basic aid

amount and must move up the date for the full phase-in of parity aid will cause little more than an ineffective addition to an inadequate plan and simply does not make the plan constitutionally acceptable.

{¶ 143} The majority evaluates the plan not for what the plan actually accomplishes, but what it wishes the plan would accomplish, including making its own additions to meet that end. Ignoring the numerous deficiencies along the way, the majority places its confidence in a General Assembly that has once again failed to comply with the Constitution.

{¶ 144} The majority ignores the directives of *DeRolph I* and *DeRolph II*, sets the bar lower than is justified, and then of course finds that the bar has been cleared. Rather than building upon the analyses of previous decisions of this court, as the majority purports to do, the majority actually weakens those precedents beyond recognition and then proclaims that the watered-down standards allegedly extracted from those decisions have been satisfied. Somehow, a half-hearted response by the state is portrayed as the basis of an acceptable solution. However, the majority imposes its own caveat—the solution is acceptable *only* after the changes ordered by the majority are implemented.

{¶ 145} In order to comply, the General Assembly not only must pass legislation to reflect the majority's order, but accordingly must find a source of funding to satisfy the majority's predilection for what a constitutional level of state support for schools must be. The majority innocuously asserts that, due to its belief in the "good faith" of the defendants, it expects the General Assembly to comply. It blandly states that if its order "receives less than full compliance, interested parties have remedies available to them." The possible consequences of a refusal to comply are glossed over, and the majority does not specifically say what the available remedies would be. Presumably, if the General Assembly fails to adopt the majority's judicially legislated amendments, the majority is prepared to hold the General Assembly in contempt for its failure, or perhaps take even more drastic action. Since

what the majority has done is in direct violation of separation of powers, it can do nothing to effectively enforce its judicial mandates. Moreover, the majority abandons precedent and enters dangerous territory in ordering that specific legislation must be enacted to make the school-funding system constitutional. School funding is a complicated and intricate system. Any changes to one aspect, while appearing to be straightforward, will cause ripple effects and give rise to unintended consequences in ways that no justice could possibly anticipate. That is why the specifics of school funding must be devised by the General Assembly and not this court.

{¶ 146} Merely raising these concerns illustrates that the majority's order is ill advised. The majority, rather than limiting itself to highlighting the deficiencies in the legislation before us as this court has been careful to do in past cases, now takes it upon itself actually to order that specific additional legislation be enacted. What the majority conveniently forgets is that this case has always been centered on satisfying the Ohio Constitution. The majority now turns that consideration on its head. Instead of satisfying the Constitution, the additional legislation must satisfy the individual inclinations of four members of this court, and only the majority's preferred legislation, and no other, is acceptable. Where was this majority when *DeRolph I* and *DeRolph II* were decided? If this type of action is legally permissible now, why not then? This case could have been concluded in 1997 by this court merely legislating a constitutional system from the bench. But as we all are aware, this court does not legally possess the power to legislate.

{¶ 147} What the majority continually fails to appreciate is that our Constitution envisions much more than a school system that barely meets the minimum needs of its pupils. Our Constitution envisions a thorough and efficient school system, not a system built on backroom deals and political expediency. When the majority proclaims what is essentially a victory for the state in this case, it is actually knelling defeat for the students and citizens of Ohio.

54

{¶ 148} The majority has ignored that " '[t]he sovereign people made it mandatory upon the General Assembly to secure not merely a system of common schools,' but rather a thorough and efficient system of common schools." *DeRolph II*, 89 Ohio St.3d 1, 728 N.E.2d 993, at paragraph one of the syllabus, quoting *Miller v. Korns* (1923), 107 Ohio St. 287, 297-298, 140 N.E. 773, 776. In surrender, the majority has accepted (and allowed itself to become entangled with) a solution that, while politically palatable, leaves a bad taste in the mouths of those of us who recognize the state's revised plan for what it is—a flawed and incomplete response to the problems at hand.

{¶ 149} In this court's opinion in *DeRolph II,* a majority of this court found that Ohio's method of funding public schools continued to violate the Thorough and Efficient Clause of the Ohio Constitution. In *DeRolph II*, at paragraph three of the syllabus, this court defined the meaning of that clause: "A thorough system means that each and every school district has enough funds to operate. An efficient system means one in which each and every school district in the state has an ample number of teachers, sound buildings that are in compliance with state building and fire codes, and equipment sufficient for all students to be afforded an educational opportunity." With today's decision, this court, while paying lip service to those principles, places its imprimatur on a system of education that still fails to meet the standards for thoroughness and efficiency mandated by the Ohio Constitution.

{¶ 150} Perhaps some who have been immersed in this litigation have lost sight of where Ohio stands among the fifty states in meeting the problems in its school-funding system. Including Ohio, the highest courts of at least sixteen states have found that their state's school-funding system violated the state Constitution.[5]

---

5. See, *e.g.*, *Roosevelt Elementary School Dist. v. Bishop* (1994), 179 Ariz. 233, 877 P.2d 806; *DuPree v. Alma School Dist. No. 30* (1983), 279 Ark. 340, 651 S.W.2d 90; *Serrano v. Priest* (1976), 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929; *Horton v. Meskill* (1977), 172 Conn. 615, 376 A.2d 359; *Rose v. Council for Better Edn.* (Ky.1989), 790 S.W.2d 186; *McDuffy v. Secy., Executive Office of Edn.* (1993), 415 Mass. 545, 615 N.E.2d 516; *Helena Elementary School Dist. No. 1 v. State*

In addition, several states have had lower courts call into question some or all aspects of their school-funding system (see, *e.g.*, lower court orders reviewed in *Opinion of the Justices* [Ala.1993], 624 So.2d 107, and *Bismarck Pub. School Dist. No. 1 v. State* [N.D.1994], 511 N.W.2d 247). Furthermore, some states, including Michigan (see Section 11, Article IX, Michigan Constitution [amended March 15, 1994 by "Proposal A"] and 1993 Mich.Pub.Act Nos. 145 and 336 and related acts cited in section 6; see, also, Mich.Comp.Laws Ann. 388.1601 *et seq.*, M.S.A. § 115.1919[901] *et seq.*) and Kansas (Finance and Quality Performance Act of 1992, 1992 Kansas Session Laws, Ch. 280, Kan.Stat.Ann. 72-6405 *et seq.*) have completely revised their school-funding system *without* a judicial order from the state's highest court to do so. Thus, Ohio is definitely not alone on the path it is pursuing among the states, many of which are facing the same problems we are facing.

{¶ 151} Furthermore, Ohio is not by any means the only state in which the state's high court has conducted multiple considerations of funding systems that have bounced back and forth among lower courts, state legislatures, and the highest court.[6] In some other states, school funding has been a persistent problem for much

(1989), 236 Mont. 44, 769 P.2d 684; *Claremont School Dist. v. Governor* (1997), 142 N.H. 462, 703 A.2d 1353; *Abbott v. Burke* (1990), 119 N.J. 287, 575 A.2d 359; *Tennessee Small School Sys. v. McWherter* (Tenn.1993), 851 S.W.2d 139; *Edgewood Indep. School Dist. v. Kirby* (Tex.1989), 777 S.W.2d 391; *Brigham v. State* (1997), 166 Vt. 246, 692 A.2d 384; *Seattle School Dist. No. 1 of King Cty. v. State* (1978), 90 Wash.2d 476, 585 P.2d 71; *Pauley v. Kelly* (1979), 162 W.Va. 672, 255 S.E.2d 859; *Washakie Cty. School Dist. One v. Herschler* (Wyo.1980), 606 P.2d 310.

6. See, *e.g., Roosevelt Elementary School Dist. v. Bishop, supra*, 179 Ariz. 233, 877 P.2d 806; *Hull v. Albrecht* (1997), 190 Ariz. 520, 950 P.2d 1141; *Hull v. Albrecht* (1998), 192 Ariz. 34, 960 P.2d 634; *Serrano v. Priest* (1971), 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241; *Serrano v. Priest, supra*, 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929; *Butt v. State* (1992), 4 Cal.4th 668, 15 Cal.Rptr.2d 480, 842 P.2d 1240; *Horton v. Meskill, supra*, 172 Conn. 615, 376 A.2d 359; *Horton v. Meskill* (1982), 187 Conn. 187, 445 A.2d 579; *Horton v. Meskill* (1985), 195 Conn. 24, 486 A.2d 1099; *Sheff v. O'Neill* (1996), 238 Conn. 1, 678 A.2d 1267; *Claremont School Dist. v. Governor* (1993), 138 N.H. 183, 635 A.2d 1375; *Claremont School Dist. v. Governor, supra*, 142 N.H. 462, 703 A.2d 1353; *Claremont School Dist. v. Governor* (1999), 144 N.H. 210, 744 A.2d 1107; *Claremont School Dist. v. Governor* (1999), 144 N.H. 590, 761 A.2d 389; *Robinson v. Cahill* (1973), 62 N.J. 473, 303 A.2d 273; *Robinson v. Cahill* (1973), 63 N.J. 196, 306 A.2d 65; *Robinson v. Cahill* (1975), 67 N.J. 35, 335 A.2d 6; *Robinson v. Cahill* (1975), 67 N.J. 333, 339 A.2d 193; *Robinson v.*

longer than it has been in this state. If there is any attitude among those in this state that this litigation is best concluded no matter the result, merely for the sake of moving the case out of our court system, I point out that in those other states, discomfort with facing this issue has not caused their courts to shirk their task in the name of expediency.

I

*DeRolph I* and *II* Highlighted Deficiencies in Previous Enactments That Were Inconsistent with a "Thorough and Efficient System of Common Schools"

{¶ 152} As stated in *DeRolph II,* 89 Ohio St.3d at 5, 728 N.E.2d at 997:

"The benchmark of our inquiry remains the Thorough and Efficient Clause, as set forth in Section 2, Article VI of the Ohio Constitution:

" 'The general assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the State * * *.' "

{¶ 153} In *DeRolph II*, 89 Ohio St.3d at 5-6, 728 N.E.2d at 998, this court quoted from Justice Francis E. Sweeney, Sr.'s majority opinion in *DeRolph I*, as follows:

"In *DeRolph I*, 78 Ohio St.3d at 212, 677 N.E.2d at 747, this court identified four aspects of the school-funding scheme in place at that time that contributed 'to the unworkability of the system and which must be eliminated.' Those four aspects were '(1) the operation of the School Foundation Program, (2) the emphasis of Ohio's school-funding system on local property tax, (3) the requirement of school

---

*Cahill* (1976), 69 N.J. 449, 355 A.2d 129; *Robinson v. Cahill* (1976), 70 N.J. 155, 358 A.2d 457; *Robinson v. Cahill* (1976), 70 N.J. 464, 360 A.2d 400; *Abbott v. Burke* (1985), 100 N.J. 269, 495 A.2d 376; *Abbott v. Burke, supra*, 119 N.J. 287, 575 A.2d 359; *Abbott v. Burke* (1994), 136 N.J. 444, 643 A.2d 575; *Abbott v. Burke* (1997), 149 N.J. 145, 693 A.2d 417; *Abbott v. Burke* (1998), 153 N.J. 480, 710 A.2d 450; *Edgewood Indep. School Dist. v. Kirby, supra*, 777 S.W.2d 391; *Edgewood Indep. School Dist. v. Kirby* (Tex.1991), 804 S.W.2d 491; *Carrollton-Farmers Branch Indep. School Dist. v. Edgewood Indep. School Dist.* (Tex.1992), 826 S.W.2d 489; *Edgewood Indep. School Dist. v. Meno* (Tex.1995), 917 S.W.2d 717.

district borrowing through the spending reserve and emergency school assistance loan programs, and (4) the lack of sufficient funding in the General Assembly's biennium budget for the construction and maintenance of public school buildings.' "

{¶ 154} This court's opinion in *DeRolph II* reviewed the legislation passed in response to *DeRolph I* and once again determined that the state's attempts to remedy the defects in the system had fallen short. Near the end of the opinion in *DeRolph II*, 89 Ohio St.3d at 37, 728 N.E.2d at 1021, this court stated:

"The following major areas warrant further attention, study, and development by the General Assembly, but are not by any means the only areas requiring scrutiny:

"(1) Continued reliance on local property taxes as a primary means to fund Ohio's schools has not been specifically addressed and may in fact be compounded by H.B. 283's phase-out of the inventory tax, which may result in even greater reliance on local contributions in the future. The failure to address this problem will make it exceedingly difficult for any system of school funding to comply with the Thorough and Efficient Clause, since the inherent inequities will remain.

"(2) The basic aid formula has structural deficiencies and may not in fact reflect the amount required per pupil to provide an adequate education. The phase-in aspect of the basic aid amount should be reconsidered.

"(3) Continuing attention must be given to the mechanism implemented to fund the construction of new school facilities and to repair older, decaying school buildings, until the task is complete. Additionally, requiring local districts to pass levies as a prerequisite for obtaining state funding should be reviewed.

"(4) The School Solvency Assistance Fund established by H.B. 412 must be reevaluated, so that funds are available and used only in case of extreme emergencies and not for unfunded mandates or day-to-day expenses.

"(5) The unfunded mandates in H.B. 412 and S.B. 55, which will necessitate either increased reliance on local property taxes or additional borrowing from the School Solvency Assistance Fund, must be addressed and immediately funded.

"(6) The phenomenon known as phantom revenue has not been eliminated and may increase as a consequence of H.B. 650.

"(7) Strict, statewide academic guidelines must be developed and rigorously followed throughout all of Ohio's public school districts."

{¶ 155} These points highlighted only some of the key concerns discussed in *DeRolph II* that stood in the way of a thorough and efficient system. Tellingly, many of those same deficiencies had been pointed out as major problems in this court's opinion in *DeRolph I*. These fundamental deficiencies continue to this day. The state's contention that it has increased the amount of money for K-12 students at the expense of every other department in the state budget cannot obscure the truth of the facts in evidence before us. Although the majority is swayed by the state's protestations, actions speak louder than words, and the state's actions fall well short of the mark.

II

Perspectives on Recent Developments and on This Court's Role in This Litigation

{¶ 156} Before debunking the defendants' claim that the revised system satisfies the Constitution, it is first necessary to put in perspective the recent history of our state's education system. The history of the system from the beginning of Ohio's statehood was thoroughly discussed in the majority and concurring opinions in *DeRolph I* and *DeRolph II* and will not be repeated here.

{¶ 157} The state has undoubtedly made some grudging progress in addressing a few of the problems that have plagued our state's system of common schools. The school-funding system that existed in 1991, when this litigation began in Perry County Common Pleas Court, was truly in crisis, as numerous problems

all contributed to a very poor system that was nowhere near being thorough and efficient. The late 1980s and early 1990s marked the absolute nadir of our statewide system of schools in Ohio.

{¶ 158} As detailed in *DeRolph I*, the system under review in that case was so disjointed, ineffective, and underfunded that it was a disgrace to the citizens of Ohio. Numerous school buildings in a depressingly large number of districts were in deplorable condition. Particularly in our large city school systems and in southeastern Ohio, it was evident that the state had shirked its responsibility to the students of the state and had consigned many of them to second-class status. The system was burdened by so many problems that some of the defendants in *DeRolph I* had not at first wanted to appeal the trial court decision that the system was unconstitutional.

{¶ 159} By the time *DeRolph I* reached this court, the General Assembly had made some unfocused attempts to rectify the most glaring problems. See 78 Ohio St.3d at 211, 677 N.E.2d at 746. After this court's decision in *DeRolph I*, the General Assembly did make further improvements, some of them fairly substantial, as detailed in *DeRolph II*, which gave some reason for optimism that significant improvements might be possible if more time was allotted for the state to devise a remedy. Based on the evidence before us, it is apparent that the system we review today is only a minimal improvement.

{¶ 160} The overriding question (indeed the only question) that we should be answering is whether the system of schools established by the legislation before us is a thorough and efficient system. Now, amazingly, the majority has taken upon itself to do its own toying with the system, has picked out the deficiencies it is willing to acknowledge, and has declared that with the adjustments it requires the system is fixed. Yet the sum of the details in evidence yields a single conclusion—the system we examine today (even as "amended" by the majority) is neither thorough nor efficient as constitutionally required.

III

A Failure of Resolve—Lack of Significant Basic Reforms Means That No Complete Systematic Overhaul Was Accomplished, and the State Has Failed Yet Again to Satisfy the Constitutional Mandate

{¶ 161} Since *DeRolph II* was decided, the General Assembly has enacted four major pieces of new legislation that are most pertinent to our inquiry. They are 2000 Am.Sub.S.B. No. 272 ("S.B. 272"), 2000 Am.Sub.S.B. No. 345 ("S.B. 345"), 2001 Am.Sub.H.B. No. 94 ("H.B. 94"), and 2001 Am.Sub.S.B. No. 1 ("S.B. 1"). In addition, much of the legislation at issue in *DeRolph II* remains relevant, particularly in the areas of school facilities construction and maintenance, but also in other areas. For instance, the state's school-funding formula and its underlying methodology closely resemble the formula before us in *DeRolph II*. Critical examination of this legislation, in particular of H.B. 94, reveals that the most recent reform package assembled by the General Assembly, as further adjusted by the majority, is disappointingly similar to the school-funding scheme found deficient in *DeRolph II*.

A

Overreliance on Local Property Taxes

{¶ 162} This court in both *DeRolph I* and *DeRolph II* informed the General Assembly in no uncertain terms that the system's overreliance on local property taxes was the single greatest impediment to a thorough and efficient system: "The most glaring weakness in the state's attempts to put in place a thorough and efficient system of education is the failure to specifically address the overreliance on local property taxes. If this problem is not rectified, it will be virtually impossible for the revised school-funding system to be characterized as thorough and efficient." *DeRolph II*, 89 Ohio St.3d at 36, 728 N.E.2d at 1020.

{¶ 163} Reiterating another of the majority's observations from *DeRolph II*, *id.* at 8, 728 N.E.2d at 999-1000: "The inherent inequities of funding systems

that rely too much on local property taxes not only are extremely difficult to rectify, but also run counter to our Constitution's explicit requirement for a *statewide* system of public schools. The valuation of local property has no connection whatsoever to the actual education needs of the locality, with the result that a system overreliant on local property taxes is by its very nature an arbitrary system that can never be totally thorough or efficient. In a very real sense, this problem underlies most of the other deficiencies in Ohio's school system and is either the direct or indirect cause of them. The majority and all three separate concurring opinions in *DeRolph I* specifically recognized the inadequacies of a system that is overreliant on local property taxes." (Emphasis *sic*.)

{¶ 164} In both *DeRolph I* and *DeRolph II*, this court found that the system was in need of a "complete systematic overhaul." See *DeRolph I*, 78 Ohio St.3d at 212, 677 N.E.2d at 747; *DeRolph II*, 89 Ohio St.3d at 17, 728 N.E.2d at 1006. There are two essential aspects of the challenge for a "complete systematic overhaul" the court has now twice issued to the state: the revenue side of the equation and the expenditure side. As to the revenue side, this court has made clear that local property taxes can still be a part of the overall revenue system, but they cannot continue to be the primary means of funding the system. *DeRolph v. State* (1997), 78 Ohio St.3d 419, 678 N.E.2d 886, 887.

{¶ 165} After the decision in *DeRolph II* was announced, the defendants were faced with some basic choices as to how to reduce overreliance on local property taxes: they could either institute major reforms to the property tax system, or they could significantly increase the adequacy level of state funding to education, or they could undertake some combination of the two approaches.

{¶ 166} Perhaps the most disappointing feature of this entire case is that, once again, the state has chosen to totally forgo making any reforms to the property tax system. Consequently, as in the previous *DeRolph* opinions, the state has not specifically addressed this overreliance, instead choosing to deal with it in the

context of revising the expenditure side of the school-funding picture. In essence, the state has claimed throughout that if it modifies the expenditure side enough, it has overhauled the system sufficiently to satisfy the Constitution. The state contends that the formula and base funding amount it has established ensure adequacy of funding, and that if a local district chooses to fund above the base amount of funding ensured by the state, it is free to do so. The state's view is that disparities in the property tax on the revenue side of funding can be rectified by increases in state funding on the expenditure side, so that if adequate per-pupil funding is provided by the state, then overreliance on local property taxes melts away.

{¶ 167} This is so, however, *only* if the state's revised plan provides truly adequate funding to each school district. If adequate funding is not provided, then the state's argument that it does not need to specifically address the problems in the revenue inequities shatters. Unfortunately, the amount of funding provided by the state under its revised plan (as modified by this court) is seriously inadequate, and the process of establishing the funding amounts was replete with inconsistencies and false assumptions.

{¶ 168} H.B. 94, the biennial budget bill, is the major piece of legislation that the state claims eliminates overreliance on local property taxes. To that end, H.B. 94 sets the base cost foundation level at $4,814 in FY02 and at $4,949 in FY03. R.C. 3317.012(A). (Under the statutes at issue in *DeRolph II*, the base amount was set to be $4,414 for FY02 and $4,538 for FY03. See former R.C. 3317.012[A], 1998 Am.Sub.H.B. No. 650, 147 Ohio Laws, Part III, 5138.) The majority orders an increase in the base funding amount above H.B. 94's provisions, but the majority's revised amount is simply not enough to make the difference needed to truly eliminate overreliance on local property taxes.

{¶ 169} It is important to keep in mind a central point about the base funding amount. It is simply an amount the state has established to reflect the supposed per-

pupil cost of a basic education. The state does not fully fund this amount for each student. In fact, in terms of total funding of the base cost amount, a large percentage is provided locally. For those districts fortunate enough to have the ability to generate a large amount of money locally, the state pays very little of the base amount.

{¶ 170} H.B. 94 also introduces the concept of "parity aid" to be phased in to provide further money to low-wealth districts (R.C. 3317.0217[C]). The majority orders that the phase-in of parity aid be moved up from FY06 to FY04, but, again, the increase provided by that amount is not enough to truly make the needed difference. Under H.B. 94's plan, parity aid, which is approximately $100 million for FY02, is to increase about $100 million per year as it is phased in, with it set to be approximately $500 million for FY06 when fully phased in. See R.C. 3317.0217(C)(1); H.B. No. 94, Section 44, line item 200-525. The majority's order to move up the date of full phase-in appears to have no effect on funding for FY02 and FY03, and will therefore have an effect only in FY04 and FY05. The parity aid amount thus becomes approximately $500 million for FY04 (rather than the approximately $300 million under H.B. 94) and approximately $500 million for FY05 (rather than the approximately $400 million scheduled under H.B. 94). The majority's ordered adjustment of parity aid thus adds a total of about $300 million more to the total funding package than what would have been provided under the plan covering FY02 to FY07 as detailed in H.B. 94. It is not clear what the majority's order in this regard does to equity aid, which was slated to be phased out by FY06 as parity aid was phased in under the H.B. 94 plan. R.C. 3317.0213(A)(7) and (B).

{¶ 171} H.B. 94 also limits the amounts any district has to pay for special education, vocational education, and transportation, so that the state picks up more of those costs for some districts (R.C. 3317.022[F]); and expands "gap aid" from the state to try to deal with phantom revenue (R.C. 3317.0216[C]). None of these provisions is really directly targeted to reduce overreliance on local property taxes—all are actually directed at other deficiencies pointed out in *DeRolph II*.

{¶ 172} This argument that the state had dealt with overreliance simply by increasing funding was soundly rejected in *DeRolph II*, 89 Ohio St.3d at 28, 728 N.E.2d at 1015: "The state's failure to specifically address the school-funding system's overreliance on local property taxes is of paramount concern as we evaluate the state's attempts to craft a thorough and efficient system of funding. The state's argument that it can minimize this problem by addressing the other aspects identified in *DeRolph I* as contributing to the unworkability of the system in place at that time, see 78 Ohio St.3d at 212, 677 N.E.2d at 747, is unconvincing. We see no indication that anything significant has been done to remove this primary impediment, which was the major factor in the previous funding system found unconstitutional in *DeRolph I*. No further effort at specifically addressing this overreliance on property taxes has been made since the voters of the state rejected the one-cent sales tax increase on the May 5, 1998 ballot. The problem of overreliance on local property taxes *must* be independently addressed, and all potential solutions to this problem must be explored. The inequities inherent in a system that relies too heavily on local property taxes will remain until this problem is resolved by the General Assembly." (Emphasis *sic*.)

{¶ 173} Further, this area of concern was the most strongly criticized in both *DeRolph I* and *DeRolph II*, and again is the overriding weakness of the state's response now. See *DeRolph II*, 89 Ohio St.3d at 26-27, 728 N.E.2d at 1013-1014:

"Overreliance on local property taxes was one of the factors that rendered the school-funding scheme deficient [in *DeRolph I*], yet this aspect of the former system persists in the state's current funding plan, *wholly unchanged*. The system's dependence on local property taxes has resulted in vast disparities among Ohio's six hundred eleven public school districts due to the differences in revenue generated by each. * * *

"The state would like this court to believe that overreliance on local property taxes will dissipate once the new measures are fully phased in, so that the

only reason a district would have to look to local property taxes would be that the district wants to fund beyond adequacy. Unfortunately, the reality of the situation at this time appears to be otherwise." (Emphasis *sic*.)

{¶ 174} The state simply has not made the "complete systematic overhaul" of the funding system that this court has called for. This court could not have been clearer than in *DeRolph II* and in *DeRolph I* that overreliance had to be independently addressed. Yet, once again, it has not been. While the "adjustments" imposed by the majority do increase somewhat the total state education spending package above the H.B. 94 level, those adjustments do nothing to rectify the inherent disparities.

B

A Lack of Adequate Funding

{¶ 175} Given that the state has chosen not to reform the property tax system, the related question is whether the state has adequately funded the system it has chosen to put in place. It is apparent that the state had no intention of actually establishing an adequate amount of state-provided funding, but instead tried to do the minimum amount it could, always with an eye to reducing spending whenever possible, in order to try to satisfy this court, rather than trying to legitimately mount an effort that complied with our Constitution. The result was a series of political bargains that established the state spending amount on education at a level the state felt it could get by on without cutting other programs too much and without raising significantly more revenue, and that had little, if any, relationship to the cost of an adequate education. The majority partakes of the same approach—ordering more funding (but not *too much* more), according to its own opinion of what the state budget can tolerate.

{¶ 176} The General Assembly, rather than exploring all potential solutions (see *DeRolph II*, 89 Ohio St.3d at 28, 728 N.E.2d at 1015) as it sought to revamp the system after *DeRolph II* was announced, seems to have operated under a two-

pronged plan. The first was to delay doing anything meaningful in response to *DeRolph II* until after the November 2000 election, in the hopes that the makeup of this court might change so that no response would be necessary. When the makeup of this court did not change, the General Assembly then realized that some type of action would be required, and so hastily assembled a perfunctory response when it became clear that the problem would not simply go away.

{¶ 177} There are essentially two failures in the state's unsatisfactory response. One is that state funding per student under the basic aid formula is inadequate, and the other is that state funding for construction and repair of school facilities is not only inadequate, but also inefficient. If the state wants to repeat its argument in *DeRolph II* that it has achieved adequacy in funding (and that overreliance on property taxes has been eliminated thereby), it has to do much more than it has done and must fund at a significantly greater level.

{¶ 178} There are many forces at work that put revenue pressure on local school districts, and the state has not acted to dispel those pressures. Two immediate examples that come to mind are the 1976 H.B. 920 tax-reduction factors, 136 Ohio Laws, Part II, 3182, discussed in *DeRolph I*, 78 Ohio St.3d at 201, 677 N.E.2d at 739, which prevent a school district from realizing additional revenue even though local property increases in valuation, and the inventory tax phase-out of 1999 H.B. 283 discussed in *DeRolph II*, 89 Ohio St.3d at 27-28, 728 N.E.2d at 993, which reduces local revenue for some districts. Another area where the state has not acted concerns the tax breaks that the state and local governments are affording businesses throughout this state. A July 2001 Wall Street Journal article about business tax abatements and their effect on the Toledo Public School District points out that Toledo-area businesses complain about the "abysmal academic record" of the district, which they claim "hampers efforts to hire well-trained workers and attract new employers." Wall Street Journal (July 18), at A1. However, the article details that, ironically, "even as they call for reform,

companies are receiving hefty breaks from the very taxes that would help pay for it. Since the late 1970s, tens of millions of dollars that would have otherwise flowed into Toledo school coffers have instead gone to businesses as tax abatements." While local business executives defend the abatements as a benefit to the community as a whole, there is no doubt that the abatements are a serious and sometimes overwhelming burden to local school districts.

{¶ 179} The Wall Street Journal article points out that Ohio is not the only state where school district revenue is being significantly reduced through tax abatements and that "Toledo is hardly alone." In other states, too, the problem is prevalent:

"[A large corporation] is seeking a two-thirds reduction in the assessed value of a big appliance plant in Louisville, Ky., where school officials estimate that the resulting loss of tax revenue would be enough to pay the annual salaries of as many as 10 teachers. [Another company] recently sought $1 billion in reduced assessments on three San Jose, Calif., properties, although a local school district warned of financial havoc, and the company's bid failed. Meanwhile, Memphis-area businesses have now received so many tax abatements that school officials in surrounding Shelby County talk of eliminating high school athletics."

{¶ 180} The General Assembly has done little to rectify problems caused by tax abatements and related revenue losses. In a system characterized by inadequate funding, local districts have great difficulty in generating additional local money to replace the money they have lost. These considerations help illustrate why, if state funding is not adequate, the system cannot be thorough and efficient.

IV

The Details of an Inadequate Response

A

The Basic Aid Formula

{¶ 181} It is evident that, as in *DeRolph II*, under the legislation we review "[t]he basic aid formula has structural deficiencies" and does not "in fact reflect the amount required per pupil to provide an adequate education." See 89 Ohio St.3d at 37, 728 N.E.2d at 1021. Once again, the basic aid formula reflects a series of compromises, characterized by giving with one hand and taking away with the other, and not by a serious attempt to deal forthrightly with the problems highlighted by this court.

{¶ 182} The type of "residual budgeting" identified by this court in *DeRolph I* was blatant. During the late 1980s and early 1990s, the General Assembly simply funded all other departments first, and then funded education with what was left, with no regard to what the cost to fund education actually should have been. See *DeRolph I,* 78 Ohio St.3d at 261, 677 N.E.2d at 780 (Resnick, J., concurring). The major deficiency of that approach was that no attempt was made to determine the cost of, and then to fund, an adequate education. As we recognized in *DeRolph II*, 89 Ohio St.3d at 19-20, 728 N.E.2d at 1008, this type of overt residual budgeting appears to have been eliminated. Within its recent budgets the state has not employed this practice, which was blatantly at odds with the Thorough and Efficient Clause of our Constitution.

{¶ 183} However, a new variant of the same phenomenon ("cost-based budgeting") appears now to be the dominant factor in the state budget process, in which the state determines first how much it wishes to spend on education and then backs out from that number to produce a formula that calls for spending that amount. This approach suspiciously resembles residual budgeting and also stands in the way of a thorough and efficient system by not placing sufficient priority on

education in the state budget. Even more evident in this case than in *DeRolph II*, the "actual cost" was "the deciding factor in selecting the method used to determine the base cost of an adequate education." See *DeRolph II,* 89 Ohio St.3d at 20, 728 N.E.2d at 1008.

{¶ 184} As mentioned above, the state, in H.B. 94, has set the base cost foundation level at $4,814 in FY02 and at $4,949 in FY03, an increase of $400 over what it had been scheduled to be in FY02 under the former formula, and an even larger increase for FY03. See R.C. 3317.012(A). To do this, the state used the expenditures of one hundred twenty-seven "high-performing districts" as the model in its new formula to set the base amount. See R.C. 3317.012(B). It is obvious that most of those one hundred twenty-seven districts cannot in reality be termed successful. A system built on such a model is inherently flawed. It appears that every time the state adjusted its sample group (for example by eliminating the top five percent of districts from consideration by applying "wealth screens"), the base amount was lowered, thus making the final result more and more suspect.

{¶ 185} The overall process engaged in by the state could be interpreted to be "residual budgeting," in that it appears that the state arbitrarily introduced factors into its determination of the base amount with the underlying intention of reducing the amount as much as it thought it could justify to this court. The majority appears to recognize that the base amount was artificially lowered, and so picks out its own solution to that specific problem—modifying the H.B. 94 approach to judicially legislate a compromise for the parties.

{¶ 186} Another significant concern is that the state reduced the range of the cost-of-doing-business factor of the formula in H.B. 94 and therefore reduced the amount that many school districts otherwise would have received. See R.C. 3317.02(N). This is important because the cost-of-doing-business factor is a multiplier that is applied to adjust the base amount to increase funding within the

formula, and a reduction in the cost-of-doing-business factor can blunt the effectiveness of an increase in the base amount for many school districts.

{¶ 187} To the state's credit, H.B. 94's $400 increase in the base amount for FY02 over what it would have been under H.B. 650 is meaningful, especially considering that the state has eliminated the phase-in criticized in *DeRolph II*. Moreover, the majority has ordered an increase above that amount. However, the majority's action in this regard underscores the fact that the H.B. 94 amount is insufficient. In addition, it is evident that other adjustments within the overall funding scheme (such as the reduction in the range of the cost-of-doing-business factor) dilute the effect of the increase in some districts. Much more must be done before the state can prove that the amount it provides under H.B. 94, as augmented by the majority, in reality will afford the benefits of a thorough and efficient system to each and every student.

{¶ 188} H.B. 94's establishment of the cost of a basic education is predicated on methodology devised by Dr. John G. Augenblick, who also devised the methodology behind the H.B. 650 system at issue in *DeRolph II*. The fundamentals of this approach are detailed in *DeRolph II*, 89 Ohio St.3d at 17-18, 728 N.E.2d at 1006-1007, and in many ways the current methodology is similar to what was at issue in *DeRolph II*.

{¶ 189} The so-called Augenblick method used in H.B. 94 for establishing basic state aid is credible on its face, but below the surface, significant problems lurk. Some of those problems are with Augenblick's methodology itself, and some are due to the state's further manipulation of that methodology. While the system in place in *DeRolph II* was based on model school districts meeting seventeen of eighteen performance standards under the former system of rating schools (see 89 Ohio St.3d at 17, 728 N.E.2d at 1007), the current H.B. 94 system is based on schools that met only twenty of twenty-seven performance standards (and even includes some school districts whose scores the state rounded upward to reach the

twenty-standards level even though those schools did not actually meet that level), with many of the top-performing districts eliminated from consideration due to the imposition of wealth screens. See R.C. 3317.012(B). There is undeniably a correlation between a school district's wealth and its level of student achievement, although the state's overall plan seems to deny that correlation in setting forth what the state considers an adequate base amount of funding.

{¶ 190} In the year on which data to determine the base amount is based, former R.C. 3302.03(B)(1) would have required a school district to achieve at least twenty-six of the twenty-seven standards to be rated effective, if there had been twenty-seven standards. 1999 Am.Sub.H.B. No. 282. After the wealth screens were applied, only ten school districts out of the one hundred twenty-seven that remained in the sample would have been rated effective. As another part of this process, the state used the lower of either 1996 spending (with a 2.8 percent per year inflation adjustment) or 1999 spending for those districts that were model school districts under both current and former law, to adjust for an alleged "echo effect." See R.C. 3317.012(B), last paragraph. This was a highly questionable practice that further allowed the state to lower the base cost formula amount.

{¶ 191} The majority, recognizing that the H.B. 94 approach is fraught with deficiencies, eliminates some of the less defensible aspects of that plan with the stroke of a pen. However, just because the majority orders that some of the most questionable features be removed from the calculations does not change the fact that many of the districts that remain in the base amount calculation as approved by the majority were not truly model districts. Of the one hundred twenty-seven model districts in the H.B. 94 plan, only 8.5 percent offer all-day, everyday kindergarten for all students and less than fifty percent of the districts offer three foreign language courses for high school students. In addition, gifted students are not being adequately served in most of these districts, and many of the districts have one or more school buildings that have major problems. The state's failure to evaluate the inputs of these

model districts will be discussed later in this opinion. In failing to take inputs into account at any step of the state's response to the school-funding problem, the state has missed an ideal opportunity to construct a constitutional system.

{¶ 192} The 2.8 percent inflation factor in the base cost foundation formula from fiscal year to fiscal year (R.C. 3317.012[A][1]) is unjustified according to evidence that school costs rise faster than the general inflation rate. One study estimates inflation for school costs to be more than 3.6 percent per year. Furthermore, as will be discussed below, the unfunded mandates the General Assembly seems intent on imposing in much of its legislation tend to increase local costs each year by an even greater amount. This portends that the H.B. 94 plan's basic aid amounts, even as increased by the majority, will be more and more inadequate as we move forward in the six-year period covered by H.B. 94.

{¶ 193} Appellees claim that, in addition to the base amount being too low, the categorical adjustments to the base amount are all underfunded. It is obvious that a thorough and efficient system should provide adequate funding for categoricals such as Disadvantaged Pupil Impact Aid ("DPIA"), special education, vocational education, transportation, and gifted education. However, H.B. 94 actually decreases DPIA funding for the biennium it covers. See H.B. 94, Section 44, line item 200-520, $360,149,243; cf. 1999 Am.Sub.H.B. No. 282, Section 4, line item 200-520, $390,708,953. That raises questions, when our large city schools have so many problems and so many DPIA students reside within the districts that have the most trouble meeting state standards. I agree with appellees that the state should undertake a major study to determine more accurately the actual costs of educating disadvantaged pupils in both inner cities and poor rural areas. It is also evident that, just as in *DeRolph II*, most of these categories remain underfunded. It is highly suspicious that a recurring consequence of the state's plan is that within each individual aspect of the system, money seems to be shifted away from our large city districts that most need it, with the smallest increases in each facet of the

plan (when there are increases) allocated to the large city districts. The majority's selective decision to legislate increases in state funding does nothing to address the very real problems caused by the underfunding of categoricals.

{¶ 194} The state's claim that it is providing a $1.4 billion increase for the biennium covered by H.B. 94 is a fiction. As Warren G. Russell's affidavit illustrates, the state does three things to arrive at that amount: (1) replaces money eliminated or otherwise reduced within H.B. 94, (2) replaces funds formerly provided from state money with federal money, and (3) reallocates funds formerly included in the foundation formula that were eliminated or reduced within H.B. 94. For example, some of that "increase" is attributable to funds that are merely meant to replace local revenue that will be lost through reduction in local taxation of public utilities. Furthermore, it is the state's method of reallocation that is the most questionable. H.B. 94's supposed $400 increase in the formula amount for FY02 is actually much less than the numbers seem to indicate, given that much of that money comes from lowering amounts for categorical spending and moving that money into the base amount.

{¶ 195} As much as anything, this reallocation indicates the manipulations that are inherent in the system before us. The state claims it is increasing the base amount by $400 in FY02. However, by decreasing the range of the cost-of-doing-business factor, by reducing DPIA funding, by allowing unfunded mandates to continue, by phasing out the local inventory tax, and by numerous other machinations, the state has created numbers that are highly suspect. The majority's decision to order an increase in the base amount, while augmenting the H.B. 94 figures, does not render the state's numbers any more reliable, only more suspect.

{¶ 196} Recognizing that school funding can overwhelm a budget, and that we are discussing extremely large amounts of money, I acknowledge that problems in our system of schools cannot be quickly corrected. The problems encountered involve enough of the state budget that the task appears to be insurmountable, but

with insight and time the problems are solvable. As the evidence in this case conclusively indicates, for a variety of reasons the costs of educating our children continue to increase well above the general inflation rate. However, the Constitution does not make the Thorough and Efficient Clause conditional. We must never lose sight of the importance of this case on the futures of the children of this state, and indeed on the future of the entire state.

## B

### Other Deficiencies

{¶ 197} Apart from the overriding flaws of the basic aid formula, there are many other deficiencies in the system. The state has used a Band-Aid approach instead of the major surgery that was required to correct these problems.

### 1

### School District Borrowing

{¶ 198} While 2000 Am.Sub.S.B. No. 345 (effective April 10, 2001), the state's response to forced borrowing concerns expressed in *DeRolph II*, has somewhat eased the forced borrowing provisions of prior law, it certainly does not eliminate them entirely. The General Assembly seems to believe that if it does not have some type of forced borrowing provision, it will have to give undeserved money to poorly administered districts, and the threat of forced borrowing is one of the motivations it uses to compel districts to be fiscally prudent. This is an example of the distrust of local school districts the state has repeatedly exhibited in enacting legislation to try to remedy school-funding problems. This distrust was also evident in much of the legislation at issue in *DeRolph II*, especially in the mandates heaped upon local districts by 1997 H.B. 412 and 1997 S.B. 55.

{¶ 199} All in all, the Solvency Assistance Program Fund remains essentially unchanged from what it was in *DeRolph II*, despite this court's admonition in that case that "[e]xcept in extreme cases, reliance on loans must be eradicated, and loans certainly must not be employed as a method to meet school

districts' daily operational expenses." *DeRolph II*, 89 Ohio St.3d at 26, 728 N.E.2d at 1013. So long as the state continues to underfund education, forced borrowing will continue to be an entrenched component of the system.

2

Unfunded Mandates

{¶ 200} In *DeRolph II*, this court pointed out why the problem of unfunded mandates came to a head after *DeRolph I* was decided:

"Both S.B. 55 and H.B. 412 were proceeding through the General Assembly at the same time as the proposed sales tax increase. On February 17, 1998, the Ohio Senate approved H.B. 697, which placed the one-cent sales tax increase on the May 5, 1998 ballot for voter approval. The one-cent sales tax increase, which appeared on the May 5 ballot as Issue 2, was not approved by voters. Consequently, school districts are required to adhere to the bills' additional requirements and standards of accountability, but the anticipated funding must now come from a different source.

"Since these mandates are essentially unfunded, a paramount concern is that H.B. 412 and S.B. 55 will impose additional costs on school districts." *DeRolph II,* 89 Ohio St.3d at 33, 728 N.E.2d at 1018.

{¶ 201} The record before us clearly confirms that, as we anticipated in *DeRolph II*, there were large additional costs imposed by these and other unfunded mandates. *Id*. at 32, 728 N.E.2d at 1018. Enacted in 2000, Am.Sub.S.B. No. 345 (see above, under borrowing) is also the state's response to the concern that increased accountability measures have led to too many unfunded mandates. In the accountability portion of S.B. 345, the state has eliminated the budget reserve requirement (rainy day fund) (R.C. 5705.29[H], repealed) and has decreased the amount a district has to put into both its textbook and instructional materials fund (R.C. 3315.17[A]) and its capital and maintenance fund (R.C. 3317.18[A]). The court in *DeRolph II* ordered the state to "immediately" fund the mandates (see 89 Ohio St.3d at 37, 728 N.E.2d at 1021). (This bill was not signed by the Governor

until January 9, 2001, nearly *eight months* after *DeRolph II* was decided. That is quite a long time to be considered immediate.) But, rather than funding anything, including past mandates that had never been funded, the state simply eliminated some of the mandates.

{¶ 202} Despite the state's arguments to the contrary, many unfunded mandates, both new and old, still exist. Further, it is predictable that many of the academic standards of S.B. 1 will essentially be unfunded mandates at some point for local school districts.

{¶ 203} It is apparent that, under the state's current education plan, there may be no *statewide* tax increases, but there will be many tax increases on the local level as more and more levies will, of necessity, be on the ballot. Since the state plan, as "adjusted" by this court, will not provide adequate funding to many local districts to cover their costs, more funds will have to be raised locally.

{¶ 204} A Legislative Service Commission staff member in the Legislative Budget Office estimated that unfunded mandates totaling $515 million per year were imposed by the General Assembly in 1997 H.B. 412 and 1997 S.B. 55. The staff member's report was initially withheld from the General Assembly by the Director of the Legislative Service Commission on the grounds that it was of questionable quality. Eventually, a draft of the report was made available to some members of the General Assembly, after several requests were made in May 2001. This report, required by R.C. 103.141 to be submitted in October 2000, was not released in time for the deliberations over S.B. 345 and would certainly have been relevant, given that a significant portion of S.B. 345 made adjustments to those mandates. Furthermore, although the draft report was made available to members of the General Assembly in the later stages of the discussion regarding H.B. 94, it was obviously ignored in the process of enacting that legislation. The state's failure to address the contents of this report in any of the legislation we review and the possible irregularities indicated by the circumstances of failing to release the report

to all members of the General Assembly in a timely manner raise serious questions about the state's commitment to funding these mandates.

3

Phantom Revenue

{¶ 205} H.B. 94 takes some steps to reduce phantom revenue by expanding gap aid (R.C. 3317.0216) and tries to adjust the formula so that it no longer assumes that more local money is raised than actually is realized. However, it does not do enough, and H.B. 94 still does not eliminate all types of phantom revenue.

{¶ 206} Phantom revenue remains a serious concern. As we stated in *DeRolph II*: "Requiring school districts to seek additional tax increases to make up for lost revenue is something that should be avoided, especially in view of our holding in *DeRolph I*, which required overreliance on local property taxes to be eliminated. The Achieve, Inc. report quoted one school superintendent who stated, 'I spend every third year running a political campaign, not running my school district.' This is not how a thorough and efficient system should function and further serves to emphasize why heavy reliance on local property taxes must end." 89 Ohio St.3d at 30-31, 728 N.E.2d at 1016.

{¶ 207} Again, since the state does not guarantee adequate funding for many districts, local levies beyond twenty-three mills will have to cover the deficiencies.

4

Development of Statewide Academic Standards

{¶ 208} Am.Sub.S.B. No. 1, signed by the Governor on June 12, 2001, the Education Standards Bill, implements the recommendations of the Governor's Commission for Student Success. S.B. 1 requires the State Board of Education to adopt statewide academic standards for each grade in selected subjects and to adopt a model curriculum. R.C. 3301.079. S.B. 1 phases out the current proficiency tests (R.C. 3301.0712), replaces them with achievement tests (R.C. 3301.0710), and

requires that the new achievement tests be aligned with the academic standards and model curricula (R.C. 3301.0710[A]). S.B. 1 revamps the system of school district report cards under new standards to be developed by the State Board of Education. R.C. 3302.02 and 3302.03. The provisions of this bill are so new that its effect remains to be seen. It directs the State Department of Education to set up the details of the plan but does not provide the specifics. Since one of the major themes of *DeRolph II* was that strict academic standards must be set and linked to assessment standards, 89 Ohio St.3d at 37, 728 N.E.2d at 1021, this bill is a first step in that direction. However, it is questionable whether these measures have been adequately funded in H.B. 94 or elsewhere, raising skepticism that solid standards will be able to be developed and thoroughly implemented.

{¶ 209} The Achieve, Inc. report quoted in *DeRolph II* recognized that the lack of standards was a significant deficiency in Ohio's system. The report pointed out that " '*[s]trictly speaking, Ohio does not really have statewide academic standards, at least as that term is used in most other states*. The absence of standards is particularly troublesome * * *.' " (Emphasis added.) *DeRolph II*, 89 Ohio St.3d at 33-34, 728 N.E.2d at 1019.

{¶ 210} Putting these statewide standards in place, S.B. 1 (as H.B. 94 did in determining the base funding amount) fails to use inputs at any point in the process. Instead, both bills are totally concerned with outputs.

{¶ 211} It is prudent to use outputs as a *part* of determining the formula, but it is clear that, at least in some way, inputs should have played a role in the system. A combination of both inputs and outputs would have ameliorated the concerns discussed above regarding the fact that many of the one hundred twenty-seven districts employed to set the base funding amount in H.B. 94 were not appropriate to serve as models. Inputs have been ignored in the formula, but they should have been considered in order to overcome this fundamental problem with the outputs-only approach.

{¶ 212} At a minimum, inputs that should be measured to determine a base amount include maximum class sizes; specific curriculum opportunities at all grade levels for all students, including advanced placement courses for high school students and foreign language opportunities in elementary schools; replacement cycles for textbooks; professional development time for all teachers; classroom materials and equipment such as computers, televisions, and VCRs; and other necessities for a thorough and efficient system.

{¶ 213} The Achieve, Inc. report quoted in *DeRolph II* noted that it was essential that all parties work together to fix the funding problem and invest in strengthening the capacity of Ohio's educators to teach at higher standards. See 89 Ohio St.3d at 37-38, 728 N.E.2d at 1022. The Achieve, Inc. report also proposed that "Ohio must mount a substantial, sustained, statewide program to equip its administrators and teachers with the skills and support they will need to substantially improve student performance." Obviously, the authors of the Achieve, Inc. report recognized that inputs must play a role in determining adequate funding, as well as in setting statewide standards. Yet H.B. 94 (funding) and S.B. 1 (setting academic standards) both totally ignore inputs. Just as the state failed to undertake any reform on the income side to solve the problem of overreliance on property tax, the state also failed to incorporate any input standards into S.B. 1 relating to academic accountability. However, if inputs are not worked into the accountability process, how can the internal efficiency of school districts be compared? If input standards are ignored, then accountability cannot be fairly implemented. Output goals and standards have little meaning if inputs are inconsistent among individual local districts. If a particular district fails to improve in meeting the output standards, the lack of firm input standards may be a key reason. But if inputs are not standardized statewide, then the required correlation is lacking. I see no indication in the record before us, or in any of the pertinent legislation including S.B. 1, that any meaningful attempt to address the lack of inputs in the system was ever mounted.

5

School Construction and Facilities Maintenance

{¶ 214} In *DeRolph II*, this court quoted from the Achieve, Inc. report relative to school facilities: " '[D]espite significant recent investments the challenge remains severe. Although estimates differ on the magnitude of the problem, *by all accounts too many Ohio children, especially in poor rural and urban districts, attend classes in dreadfully sub-standard facilities.* [Emphasis *sic*.] * * * During this decade the state has invested over $1 billion in capital improvement funds for schools, more than tripling the investments made over the previous four decades. However, without a reliable inventory of the state's facilities and a solid cost estimate for bringing all Ohio school[s] up to standard, it is impossible to know just how much progress has been made. While the state has at least made a down payment on a long deferred problem, *this is a major piece of unfinished business for Ohio's policymakers*.' (Emphasis added.)" 89 Ohio St.3d at 22, 728 N.E.2d at 1010.

{¶ 215} This court also remarked in *DeRolph II, id.* at 24, 728 N.E.2d at 1011-1012: "The task at hand is not one to be taken lightly. One-half of Ohio's school buildings are fifty years old or older. *DeRolph I,* 78 Ohio St.3d at 206, 677 N.E.2d at 742. Constructing and maintaining school buildings is an ongoing process, and this court recognizes that it would be unreasonable to require the General Assembly to remedy overnight what has taken decades of neglect to develop, yet there remains an extensive amount of work to be done in order to educate Ohio's students in 'safe and healthy learning' environments. *Id.* at 208, 677 N.E.2d at 744. Continuing funding in this area is of the utmost importance."

{¶ 216} Am.Sub.S.B. No. 272 (effective Sept. 14, 2000) is the sole new enactment since *DeRolph II* dealing with school construction and maintenance. It continues on the path that was set out in the statutes at issue in *DeRolph II*. Given the previous sorry state of neglect and the massive amount of money needed, it may

be impossible for the state to make great headway on this problem for years to come. However, while the state's programs have at least corrected the worst problems in the worst buildings, they are merely treading water in addressing many other facility problems.

{¶ 217} The state has still not done a comprehensive statewide study on facilities needs and should be faulted for not doing so. Ohio needs an immediate complete facilities assessment for all school buildings, not the watered-down version approved by the majority. The state's failure to conduct such a comprehensive study raises the suspicion that the state fears what the study would reveal. Statewide facilities needs, which were found to be $10.2 billion in a 1990 study and were estimated to be $16.5 billion in 1997, see *DeRolph II*, 89 Ohio St.3d at 20, 728 N.E.2d at 1009, have certainly increased in 2001 beyond those figures, which may have been quite conservative, despite the recent influx of state money. Although the state is supposedly operating under a twelve-year plan to rebuild Ohio's schools (see *DeRolph II, id.* at 23, 728 N.E.2d at 1011), it is clear that the problems with facilities funding for construction and maintenance will take much longer than that to resolve with the methods presently being employed by the state.

{¶ 218} In addition to simply failing to do enough soon enough, the state's plan for providing the construction money to local districts is marked by inefficiencies, bureaucratic red tape, and politics. As a result, much of the money that supposedly is available cannot be used by deserving districts. Most of the state's building programs rely on the passage of a local levy as a condition for a local district to receive state money. Once again, thoroughness and efficiency are conspicuously lacking.

{¶ 219} One recent development with significant potential is that the state has enhanced its ability to issue bonds to pay part of the state share of the costs of local projects. In *DeRolph II*, 89 Ohio St.3d at 14, 728 N.E.2d at 1004, this court noted that Senate Joint Resolution No. 1 placed on the November 2, 1999 ballot a

proposal, approved by Ohio voters, to amend the Ohio Constitution "to allow the state to issue general obligation bonds to pay for school facilities." See, principally, Section 2n, Article VIII, Ohio Constitution; see, also, 1997 Am.Sub.S.B. No. 102, Section 8, 147 Ohio Laws, Part IV, 7417. The deposition of Randall A. Fischer, executive director of the Ohio School Facilities Commission, reveals that these bonds are being issued. However, it is unclear from the record before us how effectively the bonds are being utilized and whether the state has fully taken advantage of the opportunities presented by bond issuance. Our state could benefit greatly if our legislators were able to exercise additional vision to put in place plans that would make bonds a more efficacious method of paying for school facilities.

V

Conclusion

{¶ 220} The foregoing discussion of the deficiencies in the state's "reform" package does not mention every inadequacy in the plan and touches only on some that could be developed in detail. It is my intent merely to expose the most glaring examples of the many failings within the state's plan. It is difficult to comprehend how the majority can, for the most part, uphold a plan with so many obstacles to thoroughness and efficiency. Purely political motives seem to be the driving force behind the majority's decision. As one justice concedes in a concurring opinion, she votes with the majority only to facilitate a "pragmatic compromise" that will break an impasse she considers unacceptable, even though her views on the merits have not changed.

{¶ 221} If a majority of this court had found, as I believe we should, that the Constitution still has not been satisfied, this court would have had to face the extremely difficult issue of what action to take. Perhaps an unwillingness to confront this issue was a further motivation for the majority to generally accept the state's arguments, buttressed by the majority's decision to modify the legislation by judicial fiat to render it slightly less unacceptable, and to rely on the "good faith" of the

General Assembly to comply with this court's amendments. This court has in the past resisted the calls of those who asked for a special master, who asked for findings of contempt against the Governor and members of the General Assembly, who asked that we enjoin funding of schools until a thorough and efficient system is devised, and who asked that we ourselves explicitly order funding at a specified level. I continue to adhere to the view that those remedies are not acceptable courses of action. Added to that list of possible remedies, the plaintiffs now urge that we should find all of H.B. 94 unconstitutional and therefore reject *in toto* the state biennial budget bill.

{¶ 222} Any intrusion by this court into the legislative prerogative is not a step that should be taken lightly. As we stated in *DeRolph I*, 78 Ohio St.3d at 213, 677 N.E.2d at 747, fn. 9: "[W]e recognize that the proper scope of our review is limited to determining whether the current system meets constitutional muster. We refuse to encroach upon the clearly legislative function of deciding what the new legislation will be." See, also, *DeRolph II*, 89 Ohio St.3d at 12, 728 N.E.2d at 1003 ("Our role, as we have declared in past cases, is to decide issues of constitutionality—not to legislate").

{¶ 223} The majority, in an effort to terminate this litigation, turns its back on those standards, and undertakes to do some legislating of its own, apparently on the theory that the end justifies the means. The majority increases the amount being spent by the state on our schools in an effort to placate those who believe that not enough has been done.

{¶ 224} I have serious objections to this intrusion by a majority of this court into the province of the legislature. The majority's additions to the legislative plan are tantamount to judicial legislation, and represent usurpation by the court of legislative power.

{¶ 225} The majority cites no precedents for its view that, in uniting to assemble a consensus, it has the authority to order the General Assembly to enact specific legislation that will make the school-funding system satisfactory to a

majority of this court. It is obvious why no precedents are cited—there are none available that come anywhere close to justifying the majority's position. By going to such great lengths to terminate this case, the majority is taking an unprecedented action and violating fundamental precepts that should define the role of this court in our system of government. In sitting as a superlegislature in this case, the majority abandons its judicial role and appears to view separation of powers as a hollow doctrine that can be easily tossed aside when it is expedient to do so. One justice refers to separation of powers simply as a "political doctrine."

{¶ 226} The majority's determination to order the General Assembly to enact specific legislation will undoubtedly have repercussions beyond those the majority intends. For example, the majority recognizes that its decision may implicate R.C. 3317.012(D)(4), and specifies that "the rate of millage charged off as the local share of base cost funding * * * may not be changed from twenty-three mills, irrespective of the language of" that statute. That is not the only additional section of the Revised Code that the majority's order will affect, but the extent of the majority's decision surely is not fully evident at this time. This court is not in a position to hold hearings, and cannot consult experts on whether possible unforeseen consequences lurk in the details of its mandated revisions. This further illustrates the dangers that arise when courts act as if they were legislatures.

{¶ 227} "While Ohio, unlike other jurisdictions, does not have a constitutional provision specifying the concept of separation of powers, this doctrine is implicitly embedded in the entire framework of those sections of the Ohio Constitution that define the substance and scope of powers granted to the three branches of state government." *S. Euclid v. Jemison* (1986), 28 Ohio St.3d 157, 158-159, 28 OBR 250, 251, 503 N.E.2d 136, 138. See, also, *State v. Harmon* (1877), 31 Ohio St. 250, 258, 1877 WL 19; *State ex rel. Bray v. Russell* (2000), 89 Ohio St.3d 132, 134, 729 N.E.2d 359, 361.

**{¶ 228}** In *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 475, 715 N.E.2d 1062, 1085, this court stated:

"In *State v. Hochhausler* (1996), 76 Ohio St.3d 455, 463, 668 N.E.2d 457, 465-466, Chief Justice Moyer explained as follows:

" 'The principle of separation of powers is embedded in the constitutional framework of our state government. The Ohio Constitution applies the principle in defining the nature and scope of powers designated to the three branches of the government. *State v. Warner* (1990), 55 Ohio St.3d 31, 43-44, 564 N.E.2d 18, 31. See *State v. Harmon* (1877), 31 Ohio St. 250, 258. It is inherent in our theory of government " 'that each of the three grand divisions of the government, must be protected from the encroachments of the others, so far that its integrity and independence may be preserved. * * *' " *S. Euclid v. Jemison* (1986), 28 Ohio St.3d 157, 159, 28 OBR 250, 252, 503 N.E.2d 136, 138, quoting *Fairview v. Giffee* (1905), 73 Ohio St. 183, 187, 76 N.E. 865, 866.' " See, also, Alexander Hamilton, The Federalist No. 78 (1788) (Wills Ed.1982) 394 (quoting from Montesquieu, The Spirit of Laws 181): " '[T]here is no liberty, if the power of judging be not separated from the legislative and executive powers.' "

**{¶ 229}** It is noteworthy that the author of the majority opinion, who today has few qualms in ordering the General Assembly to enact specific legislation, stated in *DeRolph I* that "it is not this court's place to * * * set policy or prioritize the allocation of funds to other state programs. Members of the legislative branch represent the collective will of the citizens of Ohio, and the manner in which public schools are funded in this state is a fundamental policy decision that is within the power of its citizens to change. Under our system of government, decisions such as imposing new taxes, allocating public revenues to competing uses, and formulating educational standards are not within the judiciary's authority." See 78 Ohio St.3d at 269-270, 677 N.E.2d at 786 (Moyer, C.J., dissenting). See, also, *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d at 526, 715

86

N.E.2d at 1119 (Moyer, C.J., dissenting) ("I bow to no one in my respect for the doctrine of separation of powers").

{¶ 230} Those in the majority in this case who were in the dissent in *DeRolph I* and *DeRolph II* have now done an about-face. They expressed the clear view in both of those cases that the system was constitutional. Now that the General Assembly has *further* improved the system, those justices somehow believe that it is only *conditionally* constitutional with the further changes this court orders the General Assembly to make.

{¶ 231} One point that cannot be overemphasized is that, were it not for previous decisions of this court in this litigation, our system of public schools would still be mired in the totally unsatisfactory condition it was in when this litigation began in 1991. We all should remember that it was only due to this lawsuit that residual budgeting for education was eliminated and the importance of our schools came to the forefront. If the justices in dissent in *DeRolph I* and *DeRolph II* had had their way, the unacceptable status quo would have endured.

{¶ 232} Furthermore, those justices who were in the majority in *DeRolph I* and *DeRolph II* and who are now in the majority in this opinion can similarly be faulted for also abandoning their previous views for the sake of reaching the all-important consensus that motivates today's decision of the court. Their professed fervor for the mandates of the Ohio Constitution, as expressed in the opinions in *DeRolph I* and *DeRolph II,* obviously has waned to the point that they are willing to enter into a political compromise that has little to do with the actual merits of this case. It is most remarkable that one of the justices who joins the majority's decision once expressed the opinion that education is a fundamental constitutional right and that, therefore, "[t]he state bears a heavy burden of demonstrating a compelling state interest for the wealth-based disparities inherent in Ohio's system of school funding." *DeRolph I*, 78 Ohio St.3d at 257, 677 N.E.2d at 777 (Douglas, J., concurring).

{¶ 233} That justice also has recognized in the past that it is not this court's role to legislate a constitutionally acceptable response, remarking in his concurring opinion in *DeRolph II*:

"The dissenters [in *DeRolph II*] can't have it both ways, and the majority opinion, recognizing this dichotomy, strikes a balance by, in specifics, respectfully pointing out the constitutional shortcomings of the General Assembly's remedial efforts while refraining from mandating a particular course of action. In doing so the majority further respects and recognizes that *it is the right and prerogative, as well as the sworn sacred duty, of the members of the General Assembly to put in place the nuts and bolts of our state's educational system*." (Emphasis added.) 89 Ohio St.3d at 39, 728 N.E.2d at 1023 (Douglas, J., concurring).

{¶ 234} That justice further observed that specifics and details of the educational system must be "debated and decided by the General Assembly rather than this court. Our *sole mission* is to see to it that the Constitution is honored * * *." (Emphasis added.) *Id*. (Douglas, J., concurring.) It is impossible to reconcile those views with the position of the majority today.

{¶ 235} In an attempt to detail his motivations for joining the majority's compromise opinion, Justice Douglas in his concurring opinion cleverly uses R.C. 1.50 to justify his position that the majority's decision does not violate the doctrine of separation of powers. In this discourse, he downplays the significance of the concept of separation of powers (relegating it to the status of a mere "political doctrine") and overplays the reach of R.C. 1.50 beyond its appropriate scope in a creative attempt to rationalize the majority's decision. It is interesting that nowhere in the majority opinion is R.C. 1.50 cited as validation for its actions.

{¶ 236} The majority finds that the state's employment of certain adjustments in determining the base funding amount and the phase-in of parity aid are unconstitutional. An indispensable aspect of severability is that the legislation remaining must be constitutional for the severance to be effective. The mere striking

of the legislation found offensive would not accomplish the majority's primary goal, which is to increase funding to a level acceptable to the justices who constitute the majority. Therefore a further consequence, wholly inconsistent with R.C. 1.50, arises, since the state must pass legislation to give effect to the majority's adjustments to the plan and must fund the increased amounts, or the system obviously remains unconstitutional. This requirement goes beyond the scope of R.C. 1.50 severance and exposes the majority's actions for what they truly are—judicial legislation that actually redrafts the substance of the legislation, masquerading as acts that supposedly are fully in accord with the separation of powers. By revising the state's methodology regarding the base amount and altering the phase-in period for parity aid, the majority fundamentally disrupts the statutory scheme, substituting its own preferences for those of the General Assembly. See *Hochhausler*, 76 Ohio St.3d at 464, 668 N.E.2d at 466, citing *State ex rel. Maurer v. Sheward* (1994), 71 Ohio St.3d 513, 523, 644 N.E.2d 369, 377 ("Prior to severing a portion of a statute, we must first determine that the severability will not fundamentally disrupt the statutory scheme of which the unconstitutional provision is a part").

{¶ 237} In his concurring opinion, Justice Douglas also underscores that the level of funding reflected in the basic aid amount is inadequate, even as increased by the majority. He points out that in Michigan, the base foundation amount for 2002 is $6,300. When the base amount set forth in H.B. 94 of $4,814 is augmented by the adjustments imposed by the majority, the base amount increases by $331 per pupil for FY02, using the numbers set out in the concurring opinion's view of what the majority adds by adjusting the base amount. This puts Ohio's base amount at $5,145 for FY02. The stark contrast between this amount and Michigan's amount of $6,300 shows how unrealistically low Ohio's base amount remains when compared to our neighbor to the north, and is compelling support for the proposition that our state's funding system is not yet thorough and efficient, even as augmented by the majority.

**{¶ 238}** Finally, Justice Douglas attempts to bolster his position by asserting that if this court were simply to hold the state's plan unconstitutional as enacted, the probable result would be a return to preexisting funding levels, thus jeopardizing increases in funding (both those of H.B. 94 and those additional increases that will result if the General Assembly enacts the legislation ordered by a majority of this court) for many districts, and that members of the court are not "willing to risk losing what has already been gained." This assertion is based on a false premise and is therefore erroneous. There is no reason to believe that, if this court had found the funding system unconstitutional, the funding increases in the H.B. 94 plan would have been eliminated. In both *DeRolph I* and *DeRolph II*, this court, even though it found the systems under review unconstitutional and challenged the state to devise a thorough and efficient system, allowed the existing system to remain in place until a new system was devised. That approach is equally feasible in this case. That some individuals and groups (especially many of our state's lawmakers) are weary of this case and may be resistant to further enactments is simply not a sufficient reason to discard that option as not viable, when we realize that the educational futures of our children are at stake.

**{¶ 239}** While the task facing the state is of such consequence that it is tempting to do what the majority has done and simply tell the General Assembly what constitutes a thorough and efficient system, that is not the prerogative of the judiciary. Rather, if the system is not thorough and efficient, this court should say so and then, as we did in *DeRolph I* and *DeRolph II*, give the General Assembly additional time to craft a constitutional system based on the momentum that has been generated thus far. Perhaps if more time is given, the General Assembly will succeed in achieving a complete and systematic overhaul of the school-funding system. The majority is unable to resist the temptation to legislate an end to this case, and so oversteps its role.

{¶ 240} A long journey begins with a single step. Some steps have been taken, but now the majority calls a halt to a journey that is nowhere near complete. In *DeRolph II*, this court held that " '[t]he attainment of efficiency and thoroughness in [the] system' of common schools is 'expressly made a purpose, not local, not municipal, but state-wide.' " *Id.,* 89 Ohio St.3d 1, 728 N.E.2d 993, paragraph two of the syllabus, quoting *Miller v. Korns* (1923), 107 Ohio St. 287, 297-298, 140 N.E. 773, 776.

{¶ 241} Our school system is still not viewed as a statewide system by some. Many raise the issue of local control, contending that local control justifies local taxation. The majority is among this group, citing the importance of local control in its praise for local property taxes.

{¶ 242} It is only recently that the focus on a statewide system, as required by the Constitution, has moved to the fore. Our state Constitution is clear in its requirement that the system of public schools is a statewide system. See *Miller v. Korns,* 107 Ohio St. at 297-298, 140 N.E. at 776. For many years, this requirement was ignored, and problems within individual school districts were viewed as distinctly local problems, which had to be solved by local efforts alone.

{¶ 243} With statewide standards and statewide testing, we should recognize that we have a state system of common schools. The state bears the ultimate responsibility to solve problems (in partnership with the local districts) that have been formerly viewed as local. Recognition of a statewide system of schools envisioned by the Constitution may take generations to fully implement. It is no wonder that people with the mindset that local problems are strictly local would resist this process. Those who are reasonably satisfied with the status quo within their own school districts fear that solutions to the problems of other local districts will be at their expense. These views must be put aside, and a bipartisan effort must continue to ensure that every child in Ohio will receive a thorough and efficient education regardless of where he or she resides.

{¶ 244} There have been successful bipartisan efforts in the past with less importance to the citizens of Ohio. In the 1980s, Ohio's Statehouse in Columbus had fallen into disrepair. It was so run down and uncared-for that it spoke poorly of the state to everyone who toured or viewed it. The Governor and the General Assembly saw the need and vowed to fix it. A true bipartisan effort was launched to restore the structure. Through different administrations and sessions of the General Assembly, our political leaders stayed the course, despite criticism of the cost (approximately $112 million), which ended up being much higher than estimated, and of the length of the project, which took six years to complete. Every day they saw the urgency of the building's failings and knew it would be a continuing problem unless it was solved the right way. Years of neglect had to be fixed, and cooperation was the common goal. Many have criticized the amount of money spent on the renovation, but the point is that our legislators ignored those criticisms and saw the task through to its end.

{¶ 245} Our school-funding system can be analogized to this Statehouse restoration project, but school funding has a much worthier goal. While the Statehouse is a building that represents our government, in this case we are dealing with the futures of our children. The state leaders who saw the necessity of concerted action in renovating the Statehouse have failed to see the necessity of bipartisan dedicated action here, to the detriment of all citizens of our state, and especially our children, who have no political voice. The same degree of commitment appears to be lacking, and I believe this lack indicates a serious failure to put the necessary emphasis on education in our state's system of priorities.

{¶ 246} It has been said, "If we refuse to fight for the dignity of truth, we substitute expedience for justice." This perceptive statement by an unknown author aptly explains the majority's motivation in reaching its decision. The majority places entirely too much importance on political expedience and not nearly enough on justice. Because the majority refuses to recognize that the state's plan we review at

this time is clearly insufficient to comply with the requirements of our Constitution, even with additional adjustments ordered by this court, I vigorously dissent.

_____

**FRANCIS E. SWEENEY, SR., J., dissenting**.

{¶ 247} Respectfully, I dissent.

{¶ 248} The genesis of this case dates back to 1991. Decades of fiscal neglect and poverty prompted student Nathan DeRolph, from property-poor Perry County, to challenge the state's failure to adequately educate its youth. Today, Nathan is an adult. What have we accomplished in all these years? Although steps have been taken to improve Ohio's primary and secondary education system, I do not believe our job is done. In my opinion, the current legislation continues to suffer from fundamental structural flaws. As a result, inequities remain and children in the poorest districts are still being deprived of an adequate education.

{¶ 249} In *DeRolph I*, we found that Ohio's elementary and secondary public school financing system was unconstitutional under Section 2, Article VI of the Ohio Constitution. In declaring the system unconstitutional, we concluded, "Ohio's public school financing scheme must undergo a complete systematic overhaul." *DeRolph v. State* (1997), 78 Ohio St.3d 193, 212, 677 N.E.2d 733, 747. We reiterated this view in *DeRolph II*, again declaring the revisions unconstitutional. *DeRolph v. State* (2000), 89 Ohio St.3d 1, 37, 728 N.E.2d 993, 1021. Today, we review additional changes that were enacted since our last decision.

{¶ 250} The majority takes the unprecedented step of declaring the system constitutional, but only after two revisions are made: (1) adjusting the base cost formula and (2) fully funding the parity aid program by fiscal year 2004.

{¶ 251} At the outset, I find it incredible that the majority takes it upon itself to make unconstitutional legislation constitutional. This represents quite a departure in philosophy from our past opinions, in which we adamantly stated that we would not instruct the General Assembly on how to remedy the system. The majority

compounds the problem by then taking a hands-off approach in the future. Rather than retain jurisdiction over the matter and help ensure that these changes are made, the majority steps aside, relying instead on the "good faith" of the defendants to implement these changes. But what assurances do we truly have that these changes and the rest of the current plan will be fully implemented?

{¶ 252} Moreover, with the majority declaring the funding plan constitutional (after the two modifications are implemented), at first glance it would appear that giant steps have been taken in restructuring the way in which we fund public schools. However, upon closer scrutiny, it is evident that the system does not encompass the systematic overhaul envisioned and mandated by this court. The new legislation merely tinkers with an existing framework that this court has twice struck down.

{¶ 253} Overreliance on property taxes continues to be the predominant root cause of the funding system's constitutional defects. Although we underscored in our prior opinions that property taxes could still be a component of the funding structure, we stated that they could not be the "primary" source of funding. The General Assembly has ignored the plain language of our mandate. Instead, it has enacted legislation that, when applied statewide, still uses property taxes as the primary means to fund our public school system. As a result, there continue to exist large disparities in per pupil funding due to the uneven distribution in taxable property valuation. This is not the result we intended.

{¶ 254} As expressed in the Education Tax Policy Institute ("ETPI") report, which analyzed the new funding changes:

"The piecemeal changes in the legislation do not fit together. They do not overhaul the school funding system. They do not end the necessity for many districts to return to the ballot on a regular basis simply to maintain existing levels of service."

{¶ 255} The need to seek additional revenues through local levies is staggering. In 1997, there were four hundred forty-seven school issues placed on

the ballot. In 2000, there were four hundred forty-six. Moreover, the change in the state's share of total revenue received by school districts is almost imperceptible: from 42.4 percent in FY93 to 43.7 percent in FY00. Even with the current budget, the state's attorney admitted in oral argument that this percentage will remain the same or will be similar under the new plan. From this, it is easy to see that there is no change in the manner in which school revenues are raised.

{¶ 256} The majority believes that the General Assembly has solved the problem of overreliance on local property taxes through increasing the base cost amount, passing parity aid and gap aid legislation, and instituting millage caps. However, rather than change the school-funding structure and create a new system that is based on something other than property tax at its core, the General Assembly has simply changed how much the state pays for schools. In doing so, the General Assembly has diverted funding from areas such as higher education, mental health, mental retardation, and other state agencies and given it to public education. Although this may generate revenue in the short term, it cannot be relied upon as a long-term solution to public education financing.

{¶ 257} There are other serious flaws inherent in the new legislative plan. Rather than discuss every deficiency, the following represent some examples of the glaring inadequacies present in the revised funding plan. For instance, in theory, the idea of subsidizing poorer districts with parity aid to compensate for the lower amount of money generated in their districts is a good one. However, in practice, it does not work. To begin with, as codified, parity aid is to be phased in over a period of five years. R.C. 3317.0217(C)(1). Even with the court's current order, if parity aid is to be phased in by 2004, it still has a limited immediate effect. Furthermore, according to the ETPI report, "[t]he ability of local effort to contribute *according to ability* remains part of the total Parity aid structure." (Emphasis *sic*.) Thus, the ability to raise sufficient revenue again is intertwined with local effort

and the ability of each district to generate sufficient income based on its property tax values.

{¶ 258} Gap aid is also fraught with problems. What the majority opinion fails to mention is that "[i]f a school district wants to levy local taxes to supplement parity aid, it can do so only by foregoing all gap aid. Gap aid occurs only at the expense of *all* local option taxes," according to the EPTI report. Another problem with gap aid is that it still results in phantom revenue. In *DeRolph II*, we stated that phantom revenue occurs " 'when the growing property wealth of a school district gives the illusion of a commensurably increasing revenue stream, which, in fact, is not realized.' " 89 Ohio St.3d at 29, 728 N.E.2d at 1015, quoting Frederick Church of the Legislative Budget Office. We found that H.B. 650, the predecessor of the new gap aid legislation, resulted in phantom revenue. *Id*. at 30, 728 N.E.2d at 1016. Since the current gap aid program is similar to that of the previously rejected provision in H.B. 650, with the exception of an additional transportation component, it too will result in phantom revenue. R.C. 3317.0216.

{¶ 259} The issue of school facilities is another major concern. The state has begun to address this monumental problem. Yet although funds are set aside by the state for the current biennium, future funding remains uncertain. Whether funding will be available depends upon the whims of the General Assembly, state surpluses, the economy, and receipt of income from the tobacco settlement. Thus, is it questionable whether the Governor's twelve-year plan will be fully implemented. Furthermore, even if there are sufficient funds available to rectify the situation, no study has been conducted to show what the facility needs of school districts are and whether they will be adequately addressed within this time period. Finally, many of the school facilities programs still require districts to pass levies as a prerequisite for obtaining school funding. *E.g.*, R.C. 3318.05. Once again, the tie-in to local property taxes continues to plague this area of school funding as well.

**{¶ 260}** Moreover, the majority fails to discuss the repeal of Ohio's local tax on business inventories. The repeal of this tax is significant and may indeed result in an increased reliance on property tax. In 1997, according to ETPI, the inventory tax generated $474 million in operating revenue, which was then 7.7 percent of total local property tax revenues.

**{¶ 261}** Finally, the majority recognizes that there is a problem with the way in which the base cost formula has been calculated. As a quick fix, the majority states that the formula should be reworked to include districts from the top and bottom five percent. Second, the formula should consider only those districts that meet twenty of the twenty-seven performance standards without rounding. Third, the base cost amount should not be lowered to adjust for the supposed echo effect. However, even with these changes, the system itself still remains constitutionally flawed. This is so because the state still has not determined what resources are necessary so that disadvantaged students can have the same opportunities to achieve as more affluent students.

**{¶ 262}** Ohio is certainly not the only state struggling with the issue of school funding. Michigan has taken the challenge head-on and has voluntarily revamped its system without court challenges. 1993 Mich.Pub.Act No. 336 and Acts cited in Section 6; see, generally, Mich. Comp. Laws Ann. 388.1601 *et seq.* Michigan has instituted a new way in which to generate school revenue by increasing its statewide sales tax and adding a statewide property tax. 1993 Pub.Acts Nos. 325, 331. However, the majority of state battles have been fought in litigation. As a result, Vermont has instituted a statewide property tax to fund education at the state support grant level of $5,000 per student, allowing additional voted local property taxes subject to an equalization formula so that any property tax rate produces the same funds per student in every district. This funding scheme was upheld in *Stowe Citizens for Responsible Government v. Vermont* (1999), 169 Vt. 559, 730 A.2d 573. New Hampshire has likewise enacted a statewide uniform

education property tax. However, this property tax was declared unconstitutional because the tax phase-in was unequal between districts. *Claremont School Dist. v. Governor* (1999), 144 N.H. 210, 744 A.2d 1107. Thus, the battle continues in that state.

{¶ 263} Apparently, in Ohio the battle is over. At the end of the day, can we truly say that we have been victorious? Have we done all that we can for Ohio's schoolchildren? Have we given the children throughout the state the same opportunities to learn and to excel? Can we say that the children in poor, rural, or urban areas have been given the same opportunities as their peers who happen to be blessed with the good fortune of living in a wealthy district with a high property tax base? In a statewide system of education, it should not matter where one lives. However, under the current funding scheme, less wealthy districts must still rely on the good graces of the General Assembly to make up revenue which property taxes fail to generate. Is this truly the legacy we want to leave?

{¶ 264} I recognize that inroads have been made and that the system is better today than it was in 1991 when this lawsuit was filed. But we have not done enough. The state still has not met its full obligation to educate the Nathan DeRolphs of tomorrow. Inherent inequities remain. By deciding that the current legislation is constitutional, after the implementation of two minor modifications, we have missed the opportunity to make a genuine commitment to improving public schools. The importance of adequately educating our youth cannot be overstated. All aspects of our community life are linked to the quality of the education our children receive. Full development of human potential serves all of society. Our founding fathers recognized the importance of public education and wanted a system that served all children, not just the wealthy among us. As stated by David McCullough in his biography of John Adams, who was speaking in the words of his time:

"[E]mphatically, [John Adams] urged the widest possible support for education. 'Laws for the liberal education of youth, especially for the lower classes of people, are so extremely wise and useful that to a humane and generous mind, no expense for this purpose would be thought extravagant.' " McCullough, John Adams (2001) 103.

{¶ 265} The hallmark of a thorough and efficient form of public education is that it works as well for the least advantaged as it does for the most advantaged. The funding system advocated by the majority sadly misses the mark.

{¶ 266} Since there have been no fundamental changes to the school-funding structure, I would find that the current legislation continues to violate the Thorough and Efficient Clause of the Ohio Constitution.

RESNICK, J., concurs in the foregoing dissenting opinion.

———————————

**COOK, J., dissenting.**

{¶ 267} It is beyond dispute that providing a thorough and efficient system of common schools for the children of the state of Ohio is both a noble and necessary endeavor. But the same Constitution that directs the General Assembly to provide such a system also constrains this court's role within Ohio's governmental framework.

{¶ 268} I continue to believe that this cause presents a nonjusticiable political question. The fundamental principle of separation of powers and the related doctrine of nonjusticiability prevent this court from deciding what a "thorough and efficient" system of public schools requires. The term "thorough and efficient" speaks to the question of educational quality, which is an issue that unquestionably involves difficult policy choices and value judgments that courts are not in the business of making. "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of [the legislature] or the confines of the Executive Branch." *Japan Whaling Assn. v. Am.*

*Cetacean Soc.* (1986), 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166, 178.

{¶ **269**} In *Baker v. Carr* (1962), 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, the United States Supreme Court identified six characteristics of political questions, any one of which may render a controversy nonjusticiable:

"[1] [A] textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] *the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion*; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question." (Emphasis added.) *Id.* at 217, 82 S.Ct. at 710, 7 L.Ed.2d at 686.

{¶ **270**} The dissent in *DeRolph v. State* (1997), 78 Ohio St.3d 193, 677 N.E.2d 733 ("*DeRolph I"),* offered a compelling explanation why the first two factors cut in favor of the conclusion that the Education Clause of the Ohio Constitution commits to the General Assembly the power to define what constitutes a "thorough and efficient" system of schools. See *id.* at 264-283, 677 N.E.2d at 782-795 (Moyer, C.J., Cook and Lundberg Stratton, JJ., dissenting). Today's decision underscores the nonjusticiability of the issue by implicating the third factor. The majority opinion is notable for the absence of genuine constitutional analysis. What the opinion sets forth instead are policy determinations "of a kind clearly for nonjudicial discretion," *Baker*, 369 U.S. at 217, 82 S.Ct. at 710, 7 L.Ed.2d at 686, thus confirming that the issues involved are nonjusticiable political questions.

{¶ 271} The majority orders the General Assembly to make specific changes that are "required" before the current funding plan will be constitutional: adjusting the base cost formula and accelerating by two years the full funding of the "parity aid program." By ordering particular legislative action—based on its own concept of what is necessary to guarantee educational quality—the majority has made an initial policy determination that the judiciary is ill-equipped to make and that is characteristic of nonjusticiability. As the Illinois Supreme Court recognized:

"It would be a transparent conceit to suggest that whatever standards of quality courts might develop would actually be derived from the constitution in any meaningful sense. Nor is education a subject within the judiciary's field of expertise, such that a judicial role in giving content to the education guarantee might be warranted. Rather, the question of educational quality is inherently one of policy involving philosophical and practical considerations that call for the exercise of legislative and administrative discretion." *Commt. for Educational Rights v. Edgar* (1996), 174 Ill.2d 1, 28-29, 220 Ill.Dec. 166, 672 N.E.2d 1178, 1191; cf. *San Antonio Indep. School Dist. v. Rodriguez* (1973), 411 U.S. 1, 43, 93 S.Ct. 1278, 1302, 36 L.Ed.2d 16, 49 ("the judiciary is well advised to refrain from imposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions").

{¶ 272} The decisions about how to define educational quality, and the related question of how we pay for the pursuit of that ideal, are better left to the legislature, which, unlike the judiciary, is a branch of government well suited to make such vitally important policy choices. "In a climate of finite resources, the General Assembly, with its function of reaching decisions through compromise and consideration of popular opinion, has the greatest legitimacy in making budget decisions that require a choice among priorities." *DeRolph v. State* (1997), 78 Ohio

St.3d 419, 425, 678 N.E.2d 886, 891 (Cook, J., dissenting). By once again choosing to adjudicate a nonjusticiable political question, today's majority continues to tread upon the General Assembly's legitimate constitutional role—thereby thwarting the will of the people of this state as expressed through their elected representatives.

{¶ 273} Even assuming that this court properly reached the merits in *DeRolph I,* I continue to believe that once this court declared the school-funding system unconstitutional, "[t]here remain[ed] nothing more for this, or any other, court to do." *DeRolph,* 78 Ohio St.3d at 424, 678 N.E.2d at 890 (Cook, J., dissenting). This court's remand to the trial court, vesting "plenary jurisdiction" to decide the constitutional validity of funding statutes that the General Assembly had not yet even enacted, violated basic precepts of appellate jurisprudence. *Id.* at 424, 678 N.E.2d at 890 (Cook, J., dissenting). This court also took the peculiar step of eschewing traditional intermediate appellate review, ordering that any decision on remand would come directly to this court. *Id.* at 421, 678 N.E.2d at 888. Such action led the majority to create a heretofore unknown "hybrid" cause in this court—a case that is "not an original action" yet "not a traditional appeal, in which the court has a previously established record available for review." *DeRolph v. State* (2001), 91 Ohio St.3d 1274, 1275, 747 N.E.2d 823, 824. There was no sound basis in law for any of these extraordinary acts.

{¶ 274} Further, when the majority again held Ohio's school-funding system unconstitutional in *DeRolph v. State* (2000), 89 Ohio St.3d 1, 728 N.E.2d 993 ("*DeRolph II*"), I dissented from the majority's assertion that it could require a revision of the General Assembly's enactments. *Id.* at 57, 728 N.E.2d at 1036 (Cook, J., dissenting). The majority's approach in *DeRolph II* violated basic tenets of our democracy. "Unless the other branches of government are to be totally subordinate to the judiciary, we cannot direct the General Assembly in the performance of its legislative duties." *DeRolph*, 78 Ohio St.3d at 425, 678 N.E.2d at 891 (Cook, J., dissenting).

**{¶ 275}** Today's decision ordering the General Assembly to adopt specific legislation not only continues *DeRolph II*'s misguided approach, but also goes a disconcerting step further. The majority has either forgotten or deliberately chosen to ignore this court's prior express assurance that it would *not* order the General Assembly to enact specific legislation as part of a remedy: "[I]t might be tempting for this court to do its own analysis, for example, determining the level of funding per pupil to achieve a thorough and efficient system, and then ordering that amount of funding. * * * However, * * * *[t]hat degree of involvement in fashioning a remedy in this case is not, nor should ever be, how we perceive our role. Our role, as we have declared in past cases, is to decide issues of constitutionality—not to legislate, as some may believe*." (Emphasis added.) *DeRolph II*, 89 Ohio St.3d at 12, 728 N.E.2d at 1003.

**{¶ 276}** Finally, I also question the majority's application of the law-of-the-case doctrine here. Contrary to the majority's assertion that the law-of-the-case doctrine "require[s]" this court to evaluate the constitutionality of the system now in place, the doctrine contains significant limitations and exceptions. It is considered to be "a rule of practice rather than a binding rule of substantive law." *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, 3, 11 OBR 1, 3, 462 N.E.2d 410, 413; see, also, *Christianson v. Colt Industries Operating Corp.* (1988), 486 U.S. 800, 817, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811, 831 ("the law-of-the-case doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power,' " quoting *Messinger v. Anderson* [1912], 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152, 1156). The procedural and substantive infirmities I have discussed suggest that this is a case to which the doctrine should not apply.

**{¶ 277}** The majority quotes Thomas Jefferson for the proposition that it is necessary to "sacrific[e] our opinions sometimes to the opinions of others for the sake of harmony." Willingness to compromise is, of course, an essential quality

for *legislators,* who must continually balance competing policy interests as they discharge their constitutionally prescribed functions. Indeed, in the very passage quoted by the majority, Jefferson discusses a *legislative* matter then pending in Congress. 16 Papers of Thomas Jefferson (Boyd Ed.1961) 598 (letter to Francis Eppes, July 4, 1790). As a *judge,* however, I am unwilling to sacrifice what the majority correctly describes as my "deeply held beliefs regarding the responsibility of the court as an institution." I am confident that my unwillingness to do so is justified, given that the majority's compromise—though well intentioned—results in an order requiring the General Assembly to enact legislation implementing a few judges' view of appropriate public policy. The judicial oath of office requires me to support the Ohio Constitution and to perform the duties of a judge—not of a legislator. See R.C. 3.23.

{¶ 278} I have opined from the outset that the Ohio Constitution commits budgetary decisions regarding school funding to the mechanisms of democracy. Yet this court continues to infringe upon matters that lie within the distinct purview of the collective judgment of our elected representatives in the Ohio General Assembly.

{¶ 279} Because I would dismiss this cause, I respectfully dissent.

_____

*Bricker & Eckler, L.L.P., Nicholas A. Pittner, John F. Birath, Jr., Sue W. Yount, Quintin F. Lindsmith* and *Susan B. Greenberger*, for appellees.

*Betty D. Montgomery,* Attorney General, *Mary Lynn Readey, Roger F. Carroll* and *James G. Tassie*, Assistant Attorneys General, for appellants.

*Walter & Haverfield, P.L.L., James E. Betts* and *Frederick W. Whatley*, for *amicus curiae* Alliance for Adequate School Funding, in support of appellees.

*John P. Concannon,* for *amicus curiae* Cincinnati School District Board of Education, in support of appellees.

*Bricker & Eckler, L.L.P.,* and *Kimball H. Carey*, for *amici curiae* Buckeye Association of School Administrators, Ohio School Boards Association, and Ohio Association of School Business Officials, in support of appellees.

*Patrick F. Timmins, Jr.*, for *amicus curiae* Coalition of Rural and Appalachian Schools, in support of appellees.

*Louis B. Geneva Co., L.P.A.*, and *M. Jayne H. Geneva*, for *amici curiae* Coalition for School Funding Reform, Cleveland Heights-University Heights City School District, Lakewood City School District, Shaker Heights City School District, and Community Advocates for Public Education, in support of appellees.

*Carson, Sowash & Ferrier* and *Herman A. Carson*, for *amicus curiae* Federal Hocking Local School District, in support of appellees.

*Hugh Calkins*, for *amicus curiae* Initiatives in Urban Education Foundation, in support of appellees.

*Courtney M. Wilson*, for *amicus curiae* League of Women Voters of Ohio, in support of appellees.

*John T. Ryerson* and *Susan Truitt*, for *amicus curiae* Ohio Association for Gifted Children, in support of appellees.

*Thomas C. Drabick, Jr.,* for *amicus curiae* Ohio Association of Public School Employees/AFSCME Local 4, AFL-CIO, in support of appellees.

*Christopher Lopez*; *Kalniz, Iorio & Feldstein Co., L.P.A., Ted Iorio* and *Christine A. Reardon*, for *amicus curiae* Ohio Education Association, in support of appellees.

*Ulmer & Berne, L.L.P., Donald J. Mooney, Jr.,* and *Yelena Boxer*; *Schnorf & Schnorf Co., L.P.A.,* and *David M. Schnorf*, for *amicus curiae* Ohio Federation of Teachers, in support of appellees.

*Ben Espy Co., L.P.A.,* and *Ben E. Espy*, for *amici curiae* members of the Ohio House of Representatives Jack Ford, Dixie J. Allen, John E. Barnes, Jr., Catherine L. Barrett, Joyce Beatty, John Boccieri, Samuel T. Britton, Kenneth A.

Carano, Mary M. Cirelli, Wayne E. Coates, Dean E. DePiero, L. George Distel, Steven L. Driehaus, Teresa Fedor, Bryan Flannery, William J. Hartnett, Peter Lawson Jones, Annie L. Key, K. Eileen Krupinski, Anthony Latell, Jr., G. Daniel Metelsky, Dale Miller, Ray Miller, Mary Rose Oakar, William L. Ogg, Robert J. Otterman, Sylvester Patton, Jr., Jeanine Perry, Chris Redfern, Ronald Rhine, Derrick Seaver, Daniel J. Sferra, Shirley A. Smith, Fred Strahorn, Erin Sullivan, Joseph P. Sulzer, Barbara Ann Sykes, Charles A. Wilson, Jr., and Claudette Woodward, and members of the Ohio Senate Leigh E. Herington, Daniel Brady, Gregory L. DiDonato, Ben E. Espy, Eric Fingerhut, Linda J. Furney, Robert F. Hagan, Mark Mallory, Rhine McLin, C.J. Prentiss, Timothy J. Ryan, and Michael C. Shoemaker, in support of appellees.

*Ben Espy Co., L.P.A.,* and *Ben E. Espy,* for *amicus curiae* Ohio Legislative Black Caucus, in support of appellees.

*Susan G. Tobin*, for *amicus curiae* Ohio Legal Rights Service, in support of appellees.

*John M. Haseley*, for *amicus curiae* United States Congressman Ted Strickland, in support of appellees.

*Benesch, Friedlander, Coplan & Aronoff* and *N. Victor Goodman*, for *amici curiae* Richard H. Finan, President of the Ohio Senate, and Larry Householder, Speaker of the Ohio House of Representatives, in support of appellants.

*Jones, Day, Reavis & Pogue, Jeffrey S. Sutton, Chad A. Readler* and *Mary Beth Young*, for *amicus curiae* Ohio Board of Regents, in support of appellants.

*Porter, Wright, Morris & Arthur, L.L.P., Robert W. Trafford, James D. Curphey, Jennifer T. Mills* and *Constance M. Greaney*, for *amici curiae* Ohio Business Roundtable, Ohio Manufacturers' Association, National Federation of Independent Business/Ohio, Ohio Council of Retail Merchants, Ohio Chamber of Commerce, and Ohio Farm Bureau Federation, in support of appellants.

*John S. Jones*, for *amicus curiae* Ohio Coalition for the Education of Children With Disabilities, in support of appellants.

*Chester, Willcox & Saxbe* and *John J. Chester*, for *amicus curiae* Ohio Governor Bob Taft, in support of appellants.

*Betty D. Montgomery,* Attorney General, and *Robert C. Maier,* Assistant Attorney General, for *amicus curiae* Tax Commissioner of Ohio, in support of appellants.

_____